May Term,
1855.

WIGGINS
v.
KEIZER.

6 252
136 538
6 252
140 383

WIGGINS, Administrator, v. KEIZER and Wife.

Testimony must be objected to when offered, or the objection will be regarded as waived.

Our statute in relation to contracts not to be performed within a year, is substantially like that of 29 *Car.* 2, c. 3, s. 4, which has always been held to apply only to contracts which, by the express stipulations of the parties, were not to be performed within a year, and not to those which might or might not, upon a contingency, be performed within a year.

That statute has no reference to agreements founded upon a past consideration.

An express promise can only revive a precedent good consideration which might have been enforced at law, through the medium of an implied promise, had it not been suspended by some positive rule of law; but can give no original right of action, if the obligation on which it is founded never could have been enforced at law, though not barred by any legal maxim or statute provision.

There is no implied promise from the father of a bastard child to the mother to furnish it a support.

A promise by the father of a bastard child to pay the step-father for the child's support, past and future, if he will continue to support it, is binding.

Thursday,
May 31.

APPEAL from the *Wayne* Court of Common Pleas.

GOOKINS, J.—*Keizer* and wife filed in the *Wayne* Common Pleas a claim against the estate of *John Mullen*, deceased, of which *Wiggins* was administrator, charging the intestate with the support, clothing, maintenance and education of an illegitimate child of the intestate, born of the wife of *Keizer* before their marriage, for six years and eleven months, commencing *December* 16, 1845, and ending *November* 1, 1852. Part of the services are stated to have been rendered by the wife before her marriage with *Keizer*, which is alleged to have taken place *July* 25, 1848, and part afterwards. A special promise by the intestate is averred.

The defendant answered, 1. By a general denial. 2. That the promise, not being in writing, was void by the statute of frauds, because it was not to be performed within one year. 3. That the promise was not made until after the services were rendered, and that there was no valid consideration to support the promise. 4. The statute of limitations. 5. That *Mullen* was not the father of

the child. 6. That no order of filiation had been made against *Mullen.* The plaintiff demurred to the second, third and sixth paragraphs of the answer, and to so much of the fourth as alleged that six years had elapsed since the promise was made, and took issue upon the fifth paragraph, and upon so much of the fourth as alleged that the cause of action had accrued more than six years before the death of *Mullen.* The demurrers were sustained. The issues were tried by the Court, who found for the plaintiffs, overruled a motion for a new trial, and gave judgment, from which the defendant appeals.

A question discussed by the appellant arises upon the fifth issue, viz., whether *Mullen* is proved to be the father of the child. The only evidence on this point is the deposition of a Mrs. *Davis.* She testifies to repeated declarations by *Mullen* that the child was his. She also testifies, that the child was born about the 16th of *September*, 1845; that Mrs. *Keizer's* first husband was a Mr. *Good*, with whom she had lived six months or a year, when he died; that about *July*, 1848, Mrs. *Good* was married to *Keizer;* that she had been the widow of *Good* about three years when she married *Keizer;* and that the child was born while she was *Good's* widow. From this testimony the appellant infers that *Good* was alive in *July*, 1845, and that a child born in *September* of that year must be presumed in law to have been his, and that the declarations of *Mullen* were inadmissible to rebut that presumption. As no objection was made to this evidence when offered, none can now be urged to its admissibility, and the only question to be considered is, how much it proves. The witness does not pretend to fix dates. She says the child's mother lived with *Good about* six months or a year, and that she had been a widow *about* three years, when *Keizer* married her in *July*, 1848. As the plaintiffs were bound to prove the issue, the defendant might perhaps have insisted from this evidence alone, that *Good* was alive in *July*, 1845; but when we consider the great improbability that *Mullen* would have acknowledged the parentage of a child born within two months after the husband's death, and his often-repeated

claim of it as his own, we think the Court was authorized to find that issue for the plaintiffs. The authorities quoted by the appellant upon the admissibility of *Mullen's* declarations, would have required an examination, had the testimony been objected to when offered.

Another position assumed by the appellant is, that the promise of *Mullen* was void by the statute of frauds, because it was not to be performed within a year. The promise proved was, that he would pay for the past and future raising of the child, and it is said that a promise to raise a child necessarily implies that the agreement is not to be performed within a year. Our statute on this subject is substantially like that of 29 *Car.* 2, c. 3, s. 4, which has always been held to apply only to contracts which, by the express stipulations of the parties, were not to be performed within a year, and not to those which might or might not, upon a *contingency*, be performed within a year. *Fenton* v. *Emblers*, 3 Burr. 1278.—*Moore* v. *Fox*, 10 Johns. R. 244. There are numerous *American* cases to the same effect. As the child may have died, within a year, the promise was not within the statute. As to the services rendered before the promise was made, it is enough to say, the statute has no reference to a past consideration.

A question of more difficulty is, whether the promise of *Mullen* was based upon a sufficient consideration. The appellees insist that there is a legal obligation upon the father of an illegitimate child to support it, because its support may be enforced, by an order of filiation; and, at least, that the moral obligation upon the father is sufficient to sustain an express promise; and several cases are referred to which are supposed to sustain the latter position.

It is proved by Mrs. *Davis* that she had often heard *Mullen* declare that the child was his; that he intended to compensate the mother liberally for its support, &c.; but none of these conversations were had in her presence. In *October*, 1852, the witness was with *Mullen* at *Keizer's* house, when he told *Keizer* and his wife that he was able to pay them for keeping the child; that he would be there again immediately after the presidential election, when he

would come prepared to pay them for all the trouble and expense of raising her thus far, and that he would then advance them money to pay for her education and support in the future. It appeared from the testimony, that *Mullen* died about the day of the presidential election, and that the child was kept at *Keizer's* until his death.

In presenting this case, no point is made by the parties upon the joining of the husband and wife, in an action on this promise, nor in regard to the effect of a promise made to them jointly. We shall, therefore, notice them no further than is necessary in determining the sufficiency of the consideration; but for that purpose we must distinguish between the services rendered before and those rendered after the marriage; and as to the former, we shall regard the case as if no marriage had taken place.

Our first inquiry, then, will be, whether the promise, in regard to the services rendered before the marriage, was based upon a sufficient consideration?

The appellees rely upon the case of *Hesketh* v. *Gowing*, 5 Esp. 131. In that case the plaintiff, not the mother, had nursed the defendant's illegitimate child, which he had visited while there, and admitted to be his. The defendant took the child home, where it was properly cared for, but the mother, against his consent, carried it back to the plaintiff, where it was kept with the defendant's knowledge. There was no order of filiation. Lord *Ellenborough* said, there was nothing in the objection that the child was illegitimate and no order of bastardy; that the father was liable, if he adopted the child; but that he could only be charged upon his contract. That question he left to the jury, who found for the plaintiff. This decision treats the question of bastardy as out of the case, and it was as if a father had allowed a member of his family to be sent to board, upon which an implied assumpsit would lie. It was not a question of moral obligation, but the common case of an implied assumpsit.

*Nichols* v. *Allen*, 3 Carr. & Payne 36, was an action for boarding the defendant's illegitimate child. It was resolved upon the same principles as the case of *Hesketh* v. *Gowing*.

May Term,
1855.

WIGGINS
v.
KEIZER.

*Tenterden*, C. J., in giving judgment, said, there was not only a moral but a legal obligation upon the defendant, and he would hold him liable unless he had refused to allow the child to be kept at his expense.

*Furrilio* v. *Crowther*, 7 Dowl. & Ry. 612, was brought by the mother against the alleged father. He had never expressly acknowledged the child as his own, but after having made some payments towards its support, refused to pay anything further, unless he could be satisfied by a magistrate's order, made on her oath, that he was the person who ought to make such payments. It was held the action would not lie.

In *Cameron* v. *Baker*, 1 Carr. & Payne 268, the defendant had been prosecuted for seduction. The suit was compromised upon the defendant's promise to pay £20 annually for the child's support. *Best*, J., said, "the father of an illegitimate child is not bound to maintain it, unless compelled by a magistrate's order, but if he consents to pay an annual support, he must continue to do so, or give notice that he intends to pay no longer." It would seem that in that case the compromise of the action for seduction was a sufficient consideration. It was held by this Court, in *Doe* v. *Horn*, 1 Ind. R. 363, that past seduction was a sufficient consideration to support a deed; and so in the case of the *Marchioness of Annandale* v. *Harris*, 2 P. W. 432; but a deed is good without a consideration, and in *Pennsylvania*, it seems that such a consideration is sufficient to support a promise; *Shenk* v. *Mingle*, 13 Serg. & R. 29.—9 Watts & Serg. 69; but it may well be doubted whether, unconnected with a compromise or some other consideration, it ought to be held sufficient. In *Binnington* v. *Wallis*, 4 B. and Ald. 650, the parties had cohabited for twelve years, when they agreed to cease their immoral conduct, and the defendant promised to pay the plaintiff £40 a year, and afterwards, in consideration that she would give up the annuity, he promised to pay her its value; and it was held that there was no consideration for the promise.

A disposition has been sometimes shown to bend the

rule of law, to accommodate cases of extreme hardship. <span style="float:right">May Term,</span>
Thus in *Cooper* v. *Martin*, 4 East 76, which was an action <span style="float:right">1855.</span>
by a step-father against his step-son, upon an express pro- <span style="float:right">WIGGINS</span>
mise to pay for his maintenance during his minority, it <span style="float:right">v.<br>KEIZER.</span>
was held, that the promise was founded on a sufficient
consideration, *especially as the plaintiff was a man of small
substance, and the defendant had a competent possession to
receive when he came of age.* Accommodating the rules
of law to particular cases, on account of their supposed
hardship, would soon introduce all that uncertainty with
which the law is so often charged.

It has often been said by eminent judges, that a moral
obligation was a sufficient consideration to support an ex-
press promise; and some misapprehensions have arisen
from the statement of the proposition thus broadly. The
manifest impracticability of extracting from the numberless
moral duties which may be demonstrated by the science of
ethics, a rule of law applicable to the business relations of
life, shows very plainly that those duties of imperfect obli-
gation are not such as are contemplated by the rule when
properly understood. If a bankrupt, after his discharge, or
a person under a disability, after the disability is removed,
or a debtor whose debt is barred by the statute of limita-
tions, expressly promises to pay his debt, the moral obliga-
tion is apparent, and the promise has a substantial basis
on which to rest, that is, a consideration actually received.
Of the various definitions which have been given of this
kind of moral obligation, we have met with none more
satisfactory than is contained in a note to *Wennall* v. *Ad-
ney*, 3 Bos. and Pul. 247. "An express promise can only
revive a precedent good consideration which might have
been enforced at law, through the medium of an implied
promise, had it not been suspended by some positive rule
of law, but can give no original right of action, if the
obligation on which it is founded never could have been
enforced at law, though not barred by any legal maxim or
statute provision."

The rule thus stated is clear, intelligible, and not diffi-
cult of application. It is true there have been departures

from it; but we think it is sustained by the current of authorities. *Wennall* v. *Adney, supra.*—*Furrillio* v. *Crowther, supra.*—*Mills* v. *Wyman,* 3 Pick. 207.—*Dodge* v. *Adams,* 19 *id.* 429.—*Ehle* v. *Judson,* 24 Wend. 97.—*Boston* v. *Dodge,* 1 Blackf. 19, note 1.

Tested by this rule the promise made by *Mullen* was not based upon a sufficient consideration, and was therefore not binding upon him. There is no implied promise from the father of a bastard child to the mother to furnish it a support. Legally it has no father.

The promise made to *Keizer* must be viewed in a different light. He was certainly under no obligation to support the child. *Mullen* requested him to continue its support, and promised to pay for it, past and future. As *Keizer* retained it until *Mullen's* death, he must be considered as having assented to his request. This brings the case within the principle of *Hesketh* v. *Gowing* and *Nichols* v. *Allen, supra.* The appellant objects, that, as to the past services, the promise was not binding; but it was an entire contract, embracing the past and the future. The case of *Bret* v. *J. S.* and wife, Cro. Eliz. 755, cited in *Wennall* v. *Adney, supra,* note *a,* was like the present. There the first husband sent his son to board with the plaintiff for three years, at £8 per annum, and died within the year, and the wife, during her widowhood, in consideration that the son should continue the residue of the time, promised to pay the plaintiff £6 13s. and 4d. for the time past, and £8 for every year after. This promise, upon the principle already stated, regarded as based upon the consideration of love and affection, would not have been binding upon the mother, but as there was connected with it the further consideration that he should remain at the plaintiff's table, it was held sufficient.

We are, therefore, of the opinion that for the support of the child by *Keizer,* from the date of his marriage with the child's mother, he is entitled to recover. This time appears to have been about four years and four months, for which we think a reasonable allowance, from the testimony, would be 280 dollars. If the appellees shall remit

the excess of the judgment below, it will be affirmed; May Term,
otherwise it will be reversed.     **1855.**

*Per Curiam.*—The excess in the judgment of the Court
of Common Pleas having been remitted by the appellees,
the judgment is affirmed.

*W. A. Bickle,* for the appellant.

*O. P. Morton,* for the appellees.