MORRIS v. NORTON.

(Circuit Court of Appeals, Sixth Circuit. July 8, 1896.)

No. 415.

1. GAMBLING CONTRACTS—SALES ON MARGIN.
Both at common law, and by the statutes of Ohio, sales and purchases by deposit of margins, and the settling of differences on the rise and fall of the market, with no intention of delivering or receiving the commodity nominally dealt in, are gambling contracts, and void.

2. COMPETENCY OF WITNESS—TRANSACTIONS WITH DECEDENT.
Rev. St. § 858, disabling the plaintiff in an action against an administrator from testifying as to any transaction with or statement by the intes-

tate, governs in all trials in the federal courts, rather than the statutes of the state in which the court is sitting.

**3. SAME.**

Dealings by one with brokers in the absence of the intestate, though with the latter's money and on his behalf, were not transactions with the intestate, within the meaning of the statute.

**4. ADMISSIONS--BY SILENCE.**

Conversations between parties to a controversy, in which one makes a statement of a fact of which both have personal knowledge, and which naturally calls for a denial by the other if the statement is untrue, are competent against the silent party, as admissions.

**5. SAME.**

While unanswered statements in letters are seldom to be regarded as admissions by the person addressed, exceptional circumstances may justify the court in submitting them to the jury with a proper caution.

**6. CONSIDERATION.**

The transfer of a claim against brokers for winnings on a gambling transaction is a good consideration for a note.

**7. SAME—MORAL OBLIGATION.**

A note given by one because he feels in honor bound to reimburse a loss incurred by the payee through trust in a broker recommended by the maker is without consideration.

**8. ILLEGAL CONTRACT.**

A note by which one merely assumes payment of a broker's obligation to pay a gambling debt, without any new consideration, is void for illegality.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is a writ of error to review a judgment rendered by the circuit court for the Eastern district of Michigan in favor of Elizabeth Norton, administratrix of John D. Norton, against Frank H. Morris, on two promissory notes. The action was begun by Morris against John D. Norton, then living, to recover the proceeds of the sale of certain real estate in Mississippi, belonging to Morris, which had come into Norton's hands as agent or trustee for Morris. The amount of these proceeds was undisputed, and the liability of Norton to account for them to Morris was conceded. The controversy arose over the right of Norton to set off against this claim two promissory notes— one for $500, and the other for $4,500—made by Morris to Norton, and held by the latter, and to have judgment for the remainder against Morris, as permitted under the common-law practice in Michigan. The defense which Morris made to the notes was that they were given for an illegal consideration; that they were given in a gambling transaction, to wit, the buying of options in oil, with no intention of acquiring property in oil, but merely to bet on the rise and fall in the market; and that they were therefore void. Norton died before the trial, and the action was revived against his administratrix. Norton's death rendered Morris an incompetent witness as to the transactions or conversations between him and Norton, and the circumstances of their dealings had to be shown by indirect testimony. It appeared that the notes had once belonged to the First National Bank of Pontiac; that the bank had brought suit on them against Morris in Cleveland, which, after evidence taken, was dismissed without prejudice; and that, upon the hearing, Norton was called to testify. Upon the trial in the court below, counsel for Morris put in Norton's testimony in the bank suit. Norton there testified that he was in the banking, lumbering, and manufacturing business at Pontiac, Mich.; that for a number of years he had been cashier of the First National Bank of that place; that the notes in suit were renewals of a note for the same total given at the time of his settlement with Morris, along in May, 1883; that Morris came to his house at Pontiac in December, 1882, and told him of the great profits there were in oil, and "about his relations with Rockefeller and those," so that he (Norton) thought Morris had an inside chance; that Morris urged him to go in, and he did put

in $3,000 at that time; that he had heard nothing about making money in oil till Morris told him; that Morris wrote him from Detroit, on his way back from Pontiac to Cleveland, that he had bought the oil. The correspondence between them is given below:

"Detroit, December 14, 1882.

"John D. Norton, Esq.—Dear Sir: I inclose telegram received here, which explains itself. This price included the commission for buying, so your profits will figure from ninety-four and a quarter. You will see from this that the panic is over, and the cause of it is running out.

"Yours, etc., F. H. Morris."

"Received at Detroit. Dated Cleveland, Ohio, December 14, 1882. To F. H. Morris, Russell House: Bought ten, ninety-four one-fourth net. Grandin well declining. Market stronger. Ninety-six one-fourth bid. Feeling more settled and steady. M. & R."

"Pontiac, Mich., December 16, 1882.

"F. H. Morris, Esq., Cleveland, Ohio—Dear Sir: I suppose you are going South. Will you put me in communication with my broker, upon the oil dicker, and let him make a report to me of the purchase, etc., and oblige,

"John D. Norton."

"December 20, 1882.

"John D. Norton, Esq.—Dear Sir: Yours received. My head man is very sick. I shall be obliged to give up my Florida trip, and attend to trade and traffic here. We had a bad break in oil yesterday, owing to a big strike. I send you the paper, which will tell you the story to-day. Has been more steady, and prices look much better this afternoon. This well does not change the real situation, and an advance is looked for by the 1st of the month,—not much before. I shall be here, so you can reach me at any time.

"Yours, etc., F. H. Morris."

"Cleveland, Ohio, December 21, 1882.

"John D. Norton—Dear Sir: The market took a decided turn to-night. The last thing, it left off eighty-one and a half. Last night it closed at eighty-five and a half,—a gain of four points,—and it is a healthy growth. Looks more solid than ever for over a week. Your friend Kelly said he had traded property with you, and now you have more of the state of Mississippi on your hands.

"Yours, etc., F. H. Morris."

"Pontiac, Mich., 12/21/1882.

"F. H. Morris, Esq., Cleveland, Ohio—Dear Sir: See the market is very panicky. Do not let me be sold out. Draw on me, if necessary, and put me in direct communication with my broker, if you are going South.

"Respectfully, yours, J. D. Norton."

"Cleveland, Ohio, December 26th.

"J. D. Norton, Esq.—Dear Sir: Market is very panicky, and is apt to take a tumble in. This week three more wells are to come in, and they are being whipped over the market. You better send me some more money to use in case of emergency, but may not need it. The situation as to the deal is not changed at all, and we are bound to have good prices again. I will send you the monthly report as soon as it is out,—a week from to-day.

"Yours, etc., F. H. Morris.

"Market 75½ this a. m."

"January 8, 1883.

"J. D. Norton—Dear Sir: Another well in to-day, knocking price off to 83½, and afterwards showing strong, and went to 87½. We now see our way out of the woods, there being but one to come in this or next week. The feeling is better than for two months, nearly, this new territory now being defined as poor. I saved you two papers of the monthly statement, and some one ran them off from my desk. I have been trying to get you another. The statement shows about five thousand barrels more consumption than production. Kelly is very anxious to hear from you.

"Yours, Frank."

"Cleveland, Ohio, January 23, 1883.

"John D. Norton, Esq.—Dear Sir: Oil got a boost this p. m. Closed ninety-nine and one-fourth. We look for it to pass the dollar point again to-morrow. Should it do so, I believe now it would be a good time to drop. The field is very bullish yet, but other influences are apt to hold it down to $1.10, or thereabouts. Still there is talk of $1.50 oil. I don't feel so. If you want it held on to longer than to-morrow, wire me. If I don't hear from you, and we have a good advance, in the absence of any new developments, I will sell.

"Yours, etc.,                                                                  F. H. Morris."

"Pontiac, Mich., February 23, 1883.

"Frank H. Morris, Cleveland—Dear Sir: Haven't heard from you lately concerning oil. I think you had better close the deal for me, if you can at any advantage.

"Respectfully, yours,                                              John D. Norton."

"Cleveland, Ohio, Feb. 24, 1883.

"John D. Norton—Dear Sir: Yours of the 23d received. The shape the market is in is, in my opinion, it is just the time to keep oil. The situation improves every day. The stock is running down now, and should the public change front, and go for it hard, the stuff would go with a bound. It has been pounded every way for two months without effect, and shown more under strength to-day than ever. They pounded it off yesterday and to-day at 98c. on report of wells, but this is healthy. I did not write, as there was nothing new.

"Yours, etc.,                                                                  F. H. Morris."

"Pontiac, Mich., 2–29, 1883.

"F. H. Morris, Cleveland—Dear Sir: Will let you use your judgment on the oil question, as you are on the ground, and can see the inside of the workings.

"Respectfully, yours,                                              John D. Norton."

"Cleveland, Ohio, March 13, 1883.

"John D. Norton—Dear Sir: Oil is very feverish, and decidedly strong. Last week they turned loose every force known to break the price, and get it down to 86, with the combined efforts of three large wells, and then it bounded away from them like a rocket, and yesterday and to-day has been on the one dollar point again. It is a full power, and cannot be got down.

"Yours, etc.,                                                                  F. H. Morris."

"Pontiac, Mich., March 30, 1883.

"F. H. Morris, 70 Bank St., Cleveland, Ohio—Dear Sir: If oil should advance, say to $1.05, I wish you would sell mine, as the carrying it is expensive.

"Respectfully yours,                                              John D. Norton."

"Cleveland, Ohio, April 23, 1883.

"John D. Norton—Dear Sir: Oil is very regular. The cause of the standstill is new developments. Those best posted say if it cannot be put down to 70 now, it can't at all, as there is no more holding now than any time, and has been all this month. I supposed we had it sold on the raise. I had order in to sell it at $1.10, but not enough was sold to catch all that was offered. It just went there, and then back. You have no fear about this investment. We will bring you out a profit. I have your order to sell at $1.05, but should get more, was I you.

"Yours, etc.,                                                                  F. H. Morris."

"Received at Cleveland, Ohio. Dated Pontiac, Mich., 5–31. To Frank H. Morris, 349 W. A. B: Close out my deal. Answer.      John D. Norton."

"June 8, 1883.

"John D. Norton—Dear Sir: I closed the oil at $1.14 3-4, and will render an account as soon as I get it.

"Yours, etc.,                                                                  F. H. Morris."

Norton testified that after receiving Morris' letter of December 26th, asking for more money, he went to Cleveland, and gave Morris a check for $1,000; that after receiving Morris' report of the sale on June 8, 1883, he went to Cleveland, and visited Morris at his office; that the account showed in his (Norton's) favor some 5,000-odd dollars, and, as Morris was perfectly good, he told Morris to give him "his note in settlement of the deal." "Q. Will you state whether, in that conversation, he said anything about Rockefeller settling up the account? A. I don't know. He gave me a note, to settle up the matter. * * * Q. Did he ever put you in communication with the brokers, Merriman & Rockefeller. (Objected to.) Will you state, Mr. Norton, then, whether, in response to your letters asking to be put into communication with your brokers, Mr. Morris ever complied with your request? A. He did not. Q. State whether Mr. Morris ever furnished you with any means of following up Merriman & Rockefeller, and writing to them. A. He did not. Q. When, as a matter of fact, did you first hear that the report of June 8th, that this oil had been sold, was not true, or was denied? A. In the letter of June 8th, Mr. Morris reports the sale. Q. When did you first hear it claimed by Mr. Morris, or any one, that nothing of the kind had occurred? A. To-day." There was much correspondence subsequent to the giving of the notes and their renewals. It was all offered by Morris, and rejected by the court, counsel for Morris excepting to the ruling. That which was material to the ruling is given below:

"Pontiac, Mich., September 18, 1883.

"F. H. Morris, Esq., 70 Bank St., Cleveland, Ohio—Dear Sir: I am in need of money, and wish you to arrange to pay the note I hold. I want it by October 1st, as I have made arrangements to use it at that time. Let me hear from you by return mail in regard to it.

"Respectfully, yours,                                    John D. Norton."

"Cleveland, Ohio, September 28, 1883.

"J. D. Norton—Dear Sir: I am out again, but in poor shape. In regard to your request for the money, I could not give you a check for the money to save me. My business has been eating up all my spare cash for months, spreading and getting it into my own hands; but, if you want it in other shape, suppose you take the land.—the estate turned over to me. I will turn them over to you gladly, and you can trade them, or sell, or I will pay you the money as soon as I can. Rockefeller is still in Europe, and I cannot do one thing until he returns.

"Yours, truly,                                           F. H. Morris."

"Cleveland, Ohio, Feb. 29, 1884.

"J. D. Norton—Dear Sir: I received notice some days ago of my note being due. I have not got a cent out of these folks, and have made up my mind I never will. Rockefeller has gone all to pieces, and is not here, and does not come to town. I have got to raise this out of my own business, and am so invested now as to cripple me if I was to do so just at this time, but am ready to give you interest, and extend the notes, say, four months more.

"Yours, etc.,                                            F. H. Morris."

"Pontiac, Mich., March 1, 1884.

"F. H. Morris, Esq., Cleveland, Ohio—Dear Sir: In reply to yours of February 29th, would say I needed money in some matters I have on my hands, and, my own notes being in the bank for as much as I wished to appear, indorsed your note, and had money on it. It now belongs to the bank, and if you could pay, say, $509 and interest, will renew three months for the $4,500. I do not want to carry the same identical paper for any great length of time in the bank. In case you do not get the money out of Rockefeller, when will you be able to pay it? The note matures March 8th. Send renewal so it will get here by that time. I indorse note of $4,500 three months. Also send me note for $509, and interest, 93 days, $90.59; and I will return old note. Send to me as cashier, so in case I should be away there will be no delay.

"Respt., yours,                                          Jno. D. Norton."

"Cleveland, Ohio, March 4, 1884.

"J. D. Norton—Dear Sir: Yours is received yesterday. It is impossible to fix $500 just at this time. The spring is always bad with us, filling in stock, and this cussed oil deal took my surplus; but I have other matters coming to a head in the next few months that will ease me up again, and I can pay you then. I think you made a mistake on the interest, $90.59. I inclose you check for $89.28, which I think is right, and, if you want to send a 45-days note for the $5,000, will try and meet it.

"Yours, etc., F. H. Morris."

"Pontiac, Mich., July 3, 1884.

"F. H. Morris, Esq., 70 Bank Street, Cleveland—Dear Sir: Why do you not send remittance for your paper, long past due, held by this bank? I notified you last fall that I had to use the paper, and at our meeting of the bank directors, held Monday, the matter was presented to them. Of course, if you do not pay them I have got to take them up. Wish an immediate reply from you as to whether or not you can pay. If you cannot pay now, when can you? And can you secure?

"Respectfully, yours, John D. Norton."

"Cleveland, Ohio, July 5, 1884.

"J. D. Norton—Dear Sir: Yours of the 3d received. I notice what you say. I am sorry you feel called upon to put so much stress on the matter. I have never and do not expect I ever shall get a cent on that matter. The men I gave the money threw me down completely on my balance, as well as yours, and the whole thing is a dead loss to me. Nevertheless, you shall have your money from me as I agreed, but I cannot possibly give it to you until I can get out of my business; and that cannot be done now without great damage to me, and in fact I could not at present at all. The matter will end all right for you, but I cannot say how soon. Although I never have or will ever get a cent of the matter, still, seeing it was through me you went into it, I will keep up the interest on same. I have sent you two new notes now to take up old ones, and you have never sent me the old ones yet, so you now have two notes of $500, and two for $4,500.

"Yours, etc., F. H. Morris."

"This was sent to Cincinnati in the wrong envelope. F. H. M."

"Pontiac, August 9, 1886.

"Frank H. Morris, Esq., 109 Wood Street, Cleveland, Ohio—Dear Sir: I want you to pay something on your notes to me. I have carried them now about three years upon the promise by you that you would reduce them. I think you can at least pay $500 on every renewal of 90 days. Let me hear from you by return mail, and oblige,

"Respectfully, yours, John D. Norton."

"Cleveland, Ohio, August 10, 1886.

"John D. Norton—Dear Sir: Yours of the 9th is received. I have been in hopes for some time that matters would shape so I might reduce that note, but I have not been able to, without crippling me in business. I have often thought it strange that you have ever, as you did once before, urge me in this matter, as in justice I should be no more holding for this act than for any other loss you have ever sustained. The only reason on earth why I ever assumed it was because I recommended these parties as good ones. I thought so, and put $10,000 of my money in their hands, that went the same as yours, but the parties who got me to this firm have never suggested such a thing as standing by my loss as I did yours. You never put but $4,000 into the deal, and it yielded you $1,000 as it stands. I had an apparent profit of several thousand, but never got any of it, nor will I, while you have already gotten several hundred from me. Now, I do not write this to repudiate in any way this account, but to show you, as I think, that when you put that money into a speculation it was, as all such deals, a chance for loss as well as gain, and that my assuming to pay the loss by a failure is far more than you will find every man willing to do, and especially to keep up interest on the same.

"Yours, truly, F. H. Morris."

"Pontiac, Mich., August 25, 1886.

"F. H. Morris, Esq.: Yours of August 10th was received in my absence. I have no knowledge of the matter of which you speak. The notes referred to are the property of the First National Bank of Pontiac, and, as they have been carried a long time, I desire them reduced. You wrote me some two years ago that you would commence to reduce them soon. I must repeat what I said in a letter before,—that the bank desires, as well as myself, to have said notes reduced. I inclose note canceled by renewal. Hope you will arrange to pay the notes soon due.

"Resp., yours,                                              Jno. D. Norton."

"Cleveland, Ohio, August 28, 1886.

"John D. Norton—Dear Sir: Will you oblige me by explaining what you mean in your letter of 25th by this: 'I have no knowledge of the matter of which you speak'? This is too indefinite. I want to know if you mean to carry the idea this money was got by me of the bank, or what you mean by it. An early reply will greatly oblige,

"Yours, etc.,                                               F. H. Morris."

"Pontiac, Mich., August 30, 1886.

"F. H. Morris, Esq.—Dear Sir: Yours of August 28th is received. I supposed my letter of August 25th was plain enough. I mean, I have no knowledge of what you lost, or how you lost it. I also mean that your notes of $5,000 are now the property of the First National Bank here, and have been for some time. When you wrote me that you would soon commence paying them, I needed the money, and put them in the bank, and obtained the same upon them. I trust you will soon commence to reduce the amount.

"Resp., yours,                                              Jno. D. Norton."

"Cleveland, Ohio, August 31, 1886.

"John D. Norton—Dear Sir: Yours of the 28th received. Yes, it seems I did understand yours of the 25th, but I could not believe you to be a man that would mean that. I understood, and so wrote for fuller explanations. It had come to me some time ago that you had said I borrowed $5,000 of the bank through you, and I have always said I did not believe that you said so; but it seems from this late correspondence that you are trying to shirk this deal off onto me, and to put an odium on me not deserved. I am lucky enough to have all your letters, and copies of mine, which show whether I have borrowed a dollar of you or the bank. If you don't know anything about the deal, what do you mean in your letter of December 21, 1882, by saying: 'I see the market is very panicky. Do not let me be sold out. Draw on me if necessary.' February 23, 1883: 'I have not heard from you lately concerning oil. I think you had better close the deal, if you can at any advantage.' March 3, 1883: 'If oil advances to, say, $1.05, I wish you would sell mine, as carrying it is expensive,' etc., etc.? Then, after trying with all my might to get this, as well as my own, and told you the reason, and explained that on account of having recommended the brokers as good, and at your request that I put it in notes, so you could use them, I did not [sic] assume a loss, which I never ought, in justice to myself or family, as I was in no way under the least obligations to assume it, it being only my desire to have my relatives there think I did all in my power to rectify the mistake of putting your money in poor hands; and my reward is abundant. Now, I don't try to make folks believe I did not speculate. I did. It was a mistake doing it as I did. I took my loss, but you propose to carry head high, having got me to put your deal in my name, and then let my friends understand I borrowed the money to speculate with. I have got your letters together, and I shall be too particular hereafter who sees them. If your appreciation of any acts with you are no deeper than shown, you need not hereafter expect me to be too particular about those notes; and, if you want to have them shown up, I don't know of any better way to get myself right before my Pontiac friends. I have now paid you better than $1,000 on this, which I had no business ever doing. I regret feeling obliged to write thus plainly, but you have hit once too often, and convinced me by

your own hand that you cared more for this money than you do my name, and would damage me, and ask me to carry your loss without a thank you. I am,

"Yours, etc., F. H. Morris."

"Cleveland, Ohio, Nov. 3, 1886.

"J. D. Norton—Dear Sir: The usual notice of note due on 7th received. I shall observe the same course with it I did on the $500, and you will have a chance to prove that I did or did not borrow the money of the bank.

"Yours. etc., F. H. Morris."

"Pontiac, Mich., Nov. 4, 1886.

"F. H. Morris, 109 Wood St., Cleveland, Ohio—Dear Sir: In reply to yours of the 3d, would say I never stated to you, or any one else, that you borrowed money from the bank. What I do say is that both notes of $500, now past due, and the note maturing Nov. 7th, of $4,500, are the property of the First National Bank; and you have known it all along, as you have kept the interest up on renewals, and have repeatedly stated in your letters that you would soon reduce them. You offered to, and was anxious to, let me have some wild lands in payment; then you offered to turn out T. A. Flower's note you held, as part payment; then you wrote to me that your business was improving, and that you would soon commence paying. Now, I understand you to say that you will observe the same course with it as of the $500 note. I suppose you mean by that to let the bank collect them if they can. Of course, if the bank fails to collect them of you, they have their redress against me. It will be the duty of the bank to use all means known to collect the same, and shall probably have to commence suit in your city against you. I know of no reason why you should refuse to pay these notes. I do not know whether a judgment against you for the amount would be collectible or not. I never looked the matter up. I had always supposed you to be an honorable man. I supposed you would do as you said. I have never felt uneasy about these notes, as I have confidence in you; and I cannot understand the tone or intent of your latter communication, unless it be that you propose to go back on your obligations. If that is your intention, please say so, and the bank will make some move in the matter.

"Resp., yours, Jno. D. Norton."

"John D. Norton—Dear Sir: I see by yours of the 4th you still profess not to know what was done with the money, etc., etc.; that you have no interest except the backing of the bank. I am sorry to see you thus, as it disappoints me in you. I originally assumed this to avoid publicity, and I would have been glad had you kept it between us. You say the bank will have to prosecute on the notes. Can you arrange with them to carry both notes if I will consent to a renewal? I cannot pay any principal yet, at least.

"Yours, etc., F. H. Morris."

"Pontiac, Mich., November 8, 1886.

"F. H. Morris, Esq., 109 Wood Street, Cleveland, Ohio—Dear Sir: Your favor of November 6th at hand, and contents noted. In reply, would say the bank will renew the notes if you will send renewal notes and the bank interest. The note of $4,500 is due to-day, and the note of $500 was due September 8, 1886. There is consequently three months' interest on the $4,500, and five months' interest on the $500, note. Am willing to do all I can to aid you in carrying these notes, and cannot understand the meaning of some of your later communications.

"Resp., yours, Jno. D. Norton, Cashier."

"Pontiac, Mich., November 27, 1886

"F. H. Morris, Esq., 109 Wood Street, Cleveland, Ohio—Dear Sir: What do you propose to do with your notes of $4,500 and $500, long past due, and which need immediate attention? Advise me at once, and oblige,

"Jno. D. Norton, Cashier."

"Cleveland, Ohio, November 29, 1886.

"John D. Norton—Dear Sir: Yours of the 27th is received. I have been looking for you to prosecute the notes, as you said you would unless paid. I am prepared to defend myself.

"Yours, etc.,

F. H. Morris."

It appeared from Mr. Norton's own evidence that when he intimated in his letter of July 3, 1884, and plainly stated in his letter of August 30, 1886, that the notes had been sold to or discounted by the bank, and were its property, he stated what was untrue, and that the $500 note did not become the property of the bank until September 7, 1886, and the $4,500 note not until November 4, 1886.

Frank Rockefeller, a partner in Merriman & Rockefeller, called for Morris, testified that he was in the brokerage commission business in Cleveland in 1882, and the first part of 1883, and that he had business dealings with Morris. After identifying the telegram which Norton admitted receiving from Morris, as one sent by his firm, his examination continued: "Q. How soon after you sent the telegram which you say you sent to Mr. Morris, in Michigan, did you receive the money,—the two or three thousand dollars? A. Very soon following,—within a few days. I couldn't say how soon, now; but it was very soon, I think. Q. Where was the money applied? A. On this special account, or special deal. Q. What ultimately became of that deal, Mr. Rockefeller? A. I could not tell, to save my life, now. When I left the house and went away,—it was either after or before,—the people we were dealing with in our house all busted, and went higher than a kite. The people that we were dealing with,—that is, the principals who were selling the oil,—they failed, and we failed, and everything was a clean-out loss, Mr. Carr. Q. That is what I want to get at. A. There was a regular crash. Q. I will ask you to state whether this deal that you have been testifying in regard to was on at that time, if you know. A. I could not swear positively. I think it was. Q. Now, what result comes of this deal, if it was on at that time? A. Well, whether it was on or off, it was an absolute loss. Q. You know that? A. Yes, sir; if you will let me explain. I quit there in May, and a very large part of the year 1883 I was about the office there but very little, and eventually dissolved my connection with it. In June I went to Europe, and was there the rest of the year, but there was no money came out of this transaction for anybody. Nobody got any money out of it. It was a loss and a failure. Q. I will ask you, Mr. Rockefeller, whether or not it is a fact that at the time this crash came you had some expectation of realizing anything out of these deals, and so expressed yourself to Mr. Morris. A. There was a prospect of the oil-country people saving something and paying something, but they never did pay anything. Q. And the other part of my question,—as to whether you so represented to Mr. Morris? (Objected to as hearsay.) A. I think very likely I did. Q. by Mr. Taylor: I will ask you whether you can state positively that you did. A. If I was going to swear, to the best of my remembrance, I should say yes, because there was a prospect for quite a time. Q. For how long a time? A. Well, I don't know how long it might have been continued after I went away, but up to the time I went away. Q. You certainly made no representations to him regarding the matter after you went to Europe? A. I had nothing to do with it after that."

Mrs. Slawson was a stenographer in the office of Merriman & Rockefeller, and her evidence as to the manner in which business was done there was as follows: "Q. What was the business of Merriman & Rockefeller at that time? A. They were brokers. Q. Of what kind? A. Oil, grain, and stocks. Q. How was the business conducted? A. By margins, and the usual speculative formula. Q. Were Merriman & Rockefeller receivers, in connection with their business, of the commodities in which they were dealing? A. You mean oil? Q. Oil; yes. A. Not to my knowledge; no, sir. Q. Had they any provision of any character for the reception of oil? A. No, sir; no tankage capacity. Q. Did they have any warehouse? A. No, sir. Q. How was the balance of Merriman & Rockefeller conducted, in relation to the final adjustment of their transactions? A. They settled upon differences. Q. What do you mean by that? Explain it a little more fully. A.

Well, if I may cite my own transaction with them. Q. Yes, you may. A. In my own case, as with other customers, if the product bought advanced in price they settled with the customers the difference between the price the property was bought at, and that it was sold for. If it was bought at a lower price than it was sold, it would pay them a profit. In case of a loss they would refund the amount of margin deposited with them which was not covered by that loss. Q. Exhausted in the loss? A. Yes, sir. Q. I will ask you if all the transactions that were had while you were there were conducted in this manner. A. Yes, sir; all that I had any knowledge of. Q. I will ask you whether the transactions of Mr. Morris that were had there were of this same character. A. Yes, sir."

Morris, the plaintiff, was called, and was permitted to testify that he had dealings in oil with Merriman & Rockefeller in 1882 and 1883, and to describe the method by which their business was conducted, with which he said he was very well acquainted. The material part of his evidence was as follows: "A. If we believed the market was going up, we would go to them, and name a price that we desired to have the oil, grain, or stock charged against us. There was a ticker running in the office, and we would watch the tape line until the price came right. Perhaps in the same day, and when it would seem to give us a profit, we would turn to them, and tell them to close it up. I might run two or three days. The converse to that, if we deemed the market was high and was likely to go down, we would say to them to sell for us certain amount,—ten or twelve thousand barrels of oil or grain, as the case might be. And then we would watch this ticker until such times as would indicate to us a profit, and we would then say to them, 'Close out the deal,' and of course if it went below there would be a profit. If it went lower, say, two cents, it would indicate two cents a bushel, or a barrel, as the case might be. If the profit ran to us,—if there was a profit in it,—he would give us a check for that amount. If, on the contrary, instead of betting right, as the case would be, the market went the other way, we had to put up two thousand dollars on it, consuming that two thousand dollars, and they would have to ask us for another thousand or two thousand on the deal; and we would put it up, if we thought it was wise; and, if not, we would let the amount which had been put in go, and take up another deal. It was settling on the tape line. Q. Did you have any provision of any character during 1882 and 1883, or at any other time, for the storage and handling of oil in bulk? A. No, sir. Q. Did Merriman & Rockefeller have any storage warehouse, or other facilities for the storing of oil or any other commodities in bulk? A. None whatever. Q. Did they do any business of that kind? A. No, sir. Q. In the business carried on by Merriman & Rockefeller in that time, was there any delivery of the commodity dealt in? A. No, sir."

The court directed the jury to return a verdict for defendant, Norton, for the difference between the amount due Morris from Norton for the land sold, and the amount of the notes. To these rulings of the court, counsel for Morris duly excepted.

J. G. Dickinson and Kline, Carr, Tolles & Goff, for plaintiff in error.
Edwin F. Conely and Orla B. Taylor, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The first question is whether there was any evidence to show that Morris' dealings for Norton with Merriman & Rockefeller were not legitimate purchases of oil, but were gambling transactions. It is well settled that sales and purchases by deposit of margins, and the settling of differences on the rise and fall of the market, with no intention of delivering or receiving the commodity nominally dealt in, are gambling contracts, and void at common law on grounds of public policy. Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160; Embrey

v. Jemison, 131 U. S. 336, 9 Sup. Ct. 776; Kahn v. Walton, 46 Ohio St. 195, 20 N. E. 203. Moreover, such purchases and sales are in violation of the act of the legislature of Ohio passed April 15, 1882 (79 Ohio Laws, p. 118), which reads as follows:

"Sec. 6934a. That whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain or other commodity, stock of any railroad or other company, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so in relation to any such commodities, shall be fined not less than twenty nor more than five hundred dollars, or confined in the county jail not exceeding six months, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void; provided that the provisions of this law shall only be held to mean and apply to such contracts where the intent of the parties thereto is that there shall not be a delivery of the commodity sold, but only a payment of differences by the parties losing upon the rise or fall of the market."

The dealings between Morris and the brokers were in Ohio, and their character would be determined by the laws of that state. The testimony of Mrs. Slawson, the stenographer, and of Morris, is very clear to the point that Merriman & Rockefeller neither delivered nor received oil, and that all settlements made with their customers were made "on the tape"; i. e. by the market reports, and without any intention of real transactions in oil. Morris testifies that all his dealings with them were of that character. Rockefeller was not asked concerning this, and there is nothing in his evidence inconsistent with actual sales and purchases of oil. Morris' evidence, however, is sufficiently broad to cover this very transaction in which he acted for Norton; and we do not see why, under the federal statute, it was not competent for him to tell just what in fact his dealing on this occasion with the brokers was. By section 858 of the Revised Statutes, this being an action against an administrator, Morris, as the party plaintiff, was not competent to testify against the defendant "as to any transaction with or statement by * * * the intestate." The section, both in its enabling and qualifying clauses, has always been held to govern trials in courts of the United States, though the state statutes of the state in which the court is sitting make different rules as to the competency of witnesses. Ex parte Fisk, 113 U. S. 713, 721, 5 Sup. Ct. 724; Monongahela Nat. Bank v. Jacobus, 109 U. S. 275, 3 Sup. Ct. 219; Potter v. Bank, 102 U. S. 163; Page v. Burnstine, 102 U. S. 664; King v. Worthington, 104 U. S. 44.

Morris' dealings with the brokers in the absence of Norton, though with his money and on his behalf, were not transactions with Norton, within the meaning of the statute. Hill v. McLean, 10 Lea, 107, 115; Jones v. Waddell, 12 Heisk. 338; Giles v. Wright, 26 Ark. 476; Insurance Co. v. Sledge, 62 Ala. 566; Huckabee v. Nelson, 54 Ala. 12; Gray v. Cooper, 65 N. C. 183; 1 Whart. Ev. § 450. Transactions with the intestate refer to things done in his presence, to which he might testify of his personal knowledge, were he alive, and not to transactions out of his hearing and presence, though they may affect the liability of his estate. Of course, Morris could not be permitted to say what he told Norton about his dealings with the brokers, or what Norton in fact knew of them, but he certainly could testify as to the real character of the contract between him and Mer-

riman & Rockefeller. This being the case, there was evidence to show that Morris was gambling with Norton's money.

Second, was there evidence to show that Norton knew the real character of the transaction? We think there was. Norton was the cashier of a bank, and a man of large experience in business. The telegrams and letters passing between Morris and Norton during the four or five months after the investment, and before the transaction was closed, are full of phrases of Norton which might lead a reasonable man to believe that he knew he was in a very speculative enterprise, and that it was to be concluded without a real investment in oil. He refers to the investment in one place as "an oil dicker." In another he says that the market is very panicky, and cautions Morris not to let him be sold out, and to draw on him to prevent it. Nominally, he had bought 10,000 barrels of oil, and had deposited $3,000 of the purchase money as a margin. He was not an oil merchant. He had no place to store the oil. It is possible that he intended to store it in a public warehouse and sell it again, or that he thought this was actually being done for him, but there are circumstances from which a contrary inference can be drawn. He once or twice refers to Morris' knowledge of the inside workings of the market, as a reason for his making the investment, and for trusting his judgment as to when to sell. The jury might infer, from the evident desire of Norton to sell the moment the market advanced, that he had gone into the scheme only to win on the rise in the market, and that real ownership in the oil was not in his mind. Considering all the circumstances, we think that, if the question is material in deciding the issues in the case, there was enough evidence tending to show Norton's knowledge of the gambling character of the investment made for him to require its submission to the jury.

We come now to consider the evidence as to the settlement. Rockefeller's testimony shows that his firm became insolvent in May because of the failure of their principal and correspondent in New York. This was before Norton ordered Morris peremptorily to sell out his oil purchase, and before June 8th, when Morris telegraphed that he had closed the oil at 1.14¾, and would render an account as soon as he got it. Norton went to Cleveland, and his account of the settlement is very short. Being asked how he came to get the notes, he said:

"The account showed in my favor 5,000-odd dollars, and Mr. Morris was perfectly good, and I told him to give me his note in settlement of the deal. Q. Will you state whether, in that conversation, he said anything about Rockefeller settling up the account? A. I don't know. He gave me a note, to settle up the matter."

The explanation is not at all full or satisfactory. It would seem to be quite inconsistent with a belief on Norton's part that the money had been realized by Morris on the transaction; for, if Morris then had the money, why should Norton suggest taking his note? There is an omission or suppression of some circumstance known to the parties to the settlement, which prompted the execution of the note. Norton's memory fails him as to whether there was any conversation concerning Rockefeller. In view of the fact that Rockefeller's firm had failed quite two weeks before, and the

investment had been with them, it might be a legitimate inference for the jury to draw that Norton was then advised that no proceeds had been realized from the reported sale, and that Morris assumed an obligation to reimburse Norton for the loss arising through the insolvency of Rockefeller's firm, and gave the note accordingly. Norton was given a full opportunity to give the details of the settlement when a witness in the bank case, and his failure to explain justifies the inference that his right to have the note paid would not be made stronger by any fuller statement of what occurred. The subsequent correspondence between Morris and Norton concerning the renewals of this note, and the original consideration, was offered in evidence, and rejected by the court on the ground that it occurred after the note was given. While the question is not free from doubt, we are of opinion that this correspondence was competent evidence against Norton's administratrix. The rule is well settled that conversations between parties to a controversy, in which one makes a statement of fact of which both have personal knowledge, and which naturally calls for a denial by the other if the statement is untrue, are competent against the silent party, as admissions, by acquiescence, of the truth of the statement. The weight of the admissions varies with the circumstances of the case, and the strength of the probability that the statement, if untrue, would have evoked a denial, and is always for the jury, guided by a proper caution of the court as to the theory upon which such conversations are admitted. Com. v. Kenney, 12 Metc. (Mass.) 235, 237; Com. v. Harvey, 1 Gray, 487, 489; 2 Whart. Ev. § 1136; 1 Greenl. Ev. § 199. With respect to written communications, however, the rule is different, because the failure of one receiving a letter to answer it may be attributed to many causes besides an acquiescence in the truth of what is written, and such a rule would furnish a dangerous weapon in the hand of an unscrupulous party to make evidence in his favor against a careless opponent. It cannot be said, however, to be an unvarying rule that an unanswered letter may not be evidence against the person addressed, because there are cases in which such letters have been admitted. Fenno v. Weston, 31 Vt. 345; Gaskill v. Skene, 14 Adol. & E. (N. S.) 668; Gore v. Hawsey, 3 Fost. & F. 509; Lucy v. Mouflet, 5 Hurl. & N. 229; Roe v. Day, 7 Car. & P. 705. These authorities are explained—some of them—on the view that a demand by the plaintiff of the defendant was necessary to the plaintiff's case, and the letter unanswered was competent to show this, but it will be observed that even in those cases the jury was permitted to draw inferences from the failure to answer the demand. The better-supported rule, probably, is that unanswered letters are ordinarily not evidence against the person addressed, as admissions of the truth of statements contained therein. Learned v. Tillotson, 97 N. Y. 8; Talcott v. Harris, 93 N. Y. 567, 571; Fearing v. Kimball, 4 Allen, 125; Percy v. Bibber, 134 Mass. 404; Commonwealth v. Eastman, 1 Cush. 189, 215. But the rule has some exceptions. Hayes v. Kelley, 116 Mass. 300; Wiggins v. Burkham, 10 Wall. 129. In Sturtevant v. Wallack, 141 Mass. 119, 4 N. E. 615, the question was of the competency of the fact that bills had been sent

to the defendant, and a letter demanding payment, and that no reply had been received, on the issue whether defendant or another was the party liable for the goods, which were sent in cases addressed to the defendant. The evidence was not objected to, but the court was asked to charge that the marking of the cases had no weight. Mr. Justice Holmes, in delivering the opinion, said:

"We do not say that the marking of the cases, alone, would have been evidence against the defendant; and we readily admit that it is not every charge, however expressly made, that calls for an answer. * * * But when a charge is of such a kind that, according to common experience, a man would naturally repudiate it if unfounded, the fact that it was made and not repudiated may be left to the jury. We cannot say that it might not have been found properly that, if the defendant had denied Tudor's authority to charge him with the machinery, he would naturally have written to the plaintiff that he was sending his bills to the wrong man, and must look to Tudor."

After all, it comes to this: that unanswered statements in letters are seldom to be regarded as admissions by the person addressed, but that exceptional circumstances may justify the court in submitting them to the jury with a proper caution. In the case at bar the letters relied upon cannot properly be said to have been unanswered. They were part of a running correspondence, in which Norton was pressing Morris for the payment of the notes, and using falsehood in respect to the ownership of the notes, in order to compel payment, and Morris was resenting the pressure, because of the circumstances under which he claimed to have given the notes,—circumstances necessarily as well known to Norton as to Morris. Morris' statements were so specific, and made such an equity in his favor, that it is highly probable that Norton would have denied the statements, if he could have done so. Instead of this, he finally answers that he had supposed Morris was an honorable man, and would do what he said he would do,—a remark rather confirmatory, than otherwise, of Morris' written version of the way in which the notes came to be made. Norton's letters bear marks of studied efforts to make no damaging admissions, and impress one who reads them that he was conscious of the truth of Morris' statements as to the circumstances under which the notes were given. In one letter, Norton denies knowledge of the facts stated in Morris' letter containing a reference to his assumption of the debt; but, when challenged in a subsequent letter, he limits his denial to the extent and manner of Morris' individual loss. The letter of August 31st from Morris was unanswered, but in subsequent letters Norton refers to statements made in it, in such a way that we think it cannot be regarded as without recognition and reply. On the whole, we think the correspondence set forth in the statement of fact, with any additional letters which Norton's administratrix may wish to introduce, if any there are, explanatory of those above set out, should be submitted to the jury, with a caution that Morris' statements concerning the giving the notes are not evidence against Norton, unless they shall be satisfied from Norton's answer and failure to reply on this point that he was silent in regard to them because he could not deny them.

We are of opinion, therefore, that there was evidence before the jury tending to show that Norton gave Morris $4,000 to gamble with

in margins on oil; that the investment was successful, in that, according to the agreement of the brokers, he was entitled to $5,000; that no proceeds were realized, however, because of the failure of the brokers; and that Morris, with Norton's knowledge and acquiescence, then assumed the loss into which he had led Norton by recommending the brokers, and gave him his note for the same. The evidence leaves it a question, upon which reasonable minds may differ, whether in the agreement of settlement it was stipulated as the consideration for the notes that Norton should transfer to Morris all his beneficial interest in the claim against the Rockefeller firm, or whether the assumption by Morris was merely a matter of honor, based on no valuable consideration at all. The decision of the question involves disputable inferences of fact, and is peculiarly within the province of the jury to decide. It is to be observed with reference to these alternative conclusions that there is a distinction between consideration and motive. "The motive for making a promise may be something entirely different from the act, or forbearance or promise thereof, which is offered and accepted in exchange for the promise." Wald, Pol. Cont. (2d Ed.) Am. editor's note, p. 9; Philpot v. Gruninger, 14 Wall. 570, 577. A sense of honor might have induced Morris to agree with Norton that, in consideration of a transfer of his claim against the Rockefeller firm, he would give the note. In that case the legal consideration would be the transfer, and the sense of honor only the motive. On the other hand, if Morris had said to Norton, "I'll assume this obligation of the broker, because I feel in honor bound to do so," and accordingly gave him the note, without any agreement between them as to the claim against the brokers, the sense of honor would have been, not only the motive, but also the consideration. "Nothing is consideration that is not regarded as such by both parties." Wald, Pol. Cont. (2d Ed.) 9; Ellis v. Clark, 110 Mass. 389; Sterne v. Bank, 79 Ind. 549, 551; Holmes, Com. Law, 293, 295. Hence the question as to the real consideration for this note is to be determined by what the parties regarded as the consideration when the notes were given, and that depends on what they said and did at the time. This is wholly a matter of conjecture from the circumstances, the conduct of the parties, and the correspondence afterwards in regard to the giving of the notes. It is our province to consider the rights of the parties on each of the alternative hypotheses above suggested. The transfer of Norton's claim against the brokers for his winnings on a gambling transaction would be a good consideration to support the obligation of Morris' note. This would be so on two grounds: First, the assignment of the right to the fruits of an illegal transaction after the transaction has been closed is not illegal. The assignment would not be in furtherance of the illegal purpose of the original contract, and no public policy forbids a transfer of the unenforceable rights which may grow out of such a contract after the contract and its purpose are things of the past. McBlair v. Gibbes, 17 How. 231, 235, 237; Armstrong v. Toler, 11 Wheat. 258, 269; Rothrock v. Perkinson, 61 Ind. 39; Buchanan v. Bank, 5 C. C. A. 83, 6 U. S. App. 566, 577, 55 Fed. 223; Wald, Pol. Cont. (2d Ed.) 325;

Greenh. Pub. Pol. 36. In such a case there is the possibility that the person owing the illegal debt may not rely on the illegality as a defense, and, considering it a matter of honor, may pay it. This possibility makes the assignment of the claim a valuable consideration. More than this, under the act of 1882 (79 Ohio Laws, p. 118), and section 4270 of the Revised Statutes of Ohio, as construed by the supreme court of Ohio in Lester v. Buel, 49 Ohio St. 240, 30 N. E. 821, Norton would have the right to recover back the $4,000 from the brokers with whom the gambling was done; and we see no reason why an assignment by Norton of his claim against the brokers would not carry this right with it. The right to recover $4,000 from the brokers would certainly constitute a good and valuable consideration to support Morris' note. On the hypothesis that the jury may find from the evidence that the note was given by Morris for the consideration that he felt in honor bound to reimburse the loss Norton had made through trust in brokers recommended by him, and that there was no stipulation as to the transfer of the claim from Norton to Morris, a different result follows. The note could not be enforced, because Morris' sense of honor was not a valuable consideration. Eastwood v. Kenyon, 11 Adol. & E. 438, 446; Mills v. Wyman, 3 Pick. 207; Dodge v. Adams, 19 Pick. 429; Wiggins v. Keizer, 6 Ind. 252; Hendricks v. Robinson, 56 Miss. 694; Dearborn v. Bowman, 3 Metc. (Mass.) 155; Updike v. Titus, 13 N. J. Eq. 151; Cook v. Bradley, 7 Conn. 57; Wald, Pol. Cont. (2d Ed.) 169. More than this, the note would be void for illegality, because it would merely be evidence of Morris' assumption of the brokers' obligation to pay a gambling debt, without any new consideration. It would be the same debt, with only a change of debtors, and would be subject to the same defense of illegality by the new debtor as by the old. Coulter v. Robertson, 14 Smedes & M. 18; Edwards v. Skirving, 1 Brev. 548; Blasdel v. Fowle, 120 Mass. 447.

The result of our consideration of this case is that upon the testimony admitted, and which should have been admitted, there was evidence enough to sustain a special verdict by the jury, upon which judgment would have to be entered in favor of Morris on the question of the legality and binding effect of the two notes in suit, which were only renewals of the original note. The action of the court below in excluding evidence, and in directing a verdict for Norton's administratrix, was therefore erroneous. The judgment of the circuit court is reversed, at the costs of defendant in error, with directions to order a new trial.