# Hoosier Drilling Co. et al. v. Ellis et al.

March 1, 1940.

M. L. Blackwell, Judge.

Cary, Miller & Kirk, T. E. Sandidge and O. L. Fowler for appellants.

E. B. Anderson for appellee Ellis.

Pentecost & Dorsey for appellee Jones.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

On June 17, 1937, J. F. Bolinger, a representative of the appellant, Hoosier Drilling Company, a corpora-

tion engaged in the operation and development of oil and gas leasehold estates in Western Kentucky, procured from the appellees, K. A. Jones and his wife, Addie B. Jones, an oil and gas lease covering 194½ acres in Henderson County. This acreage embraced two tracts of 49½ and 145 acres respectively. The testimony for appellants indicates that the Company particularly desired the lease on the 49½-acre tract, as it was one of several farms located on what E. L. Newton, president of the Company, believed was the top of the dome of an underlying structure containing the desired minerals. Included in the same general area of approximately 5,000 acres on which the Company had obtained leases were the farms of C. T. Boswell and C. T. Blackwell, although the Company contends that the Boswell farm which was within 135 yards of the Jones boundary was not within the territory regarded as especially promising. The Blackwell farm, which the Company contends was the most desirable for the purpose of sinking a test well, was approximately one-half mile distant. The lease was prepared by Bolinger at the office of the Company following several conversations with Jones, and was on the usual printed form employed by the Company, except that by insertions, some typed and others by hand, the Company agreed to complete a well on the Jones premises within one year from the date of the lease "or lease is null and void," and further:

> "If a well is not commenced on the block of which this lease is a part on or before January 1, 1938, this lease shall be null and void. Said block consists of the above lease and others as follows: Jas. McHatton—M. Pitt—Landy Mauzy—Gatewood heirs—O. L. Boswell—C. T. Boswell—C. A. Dempewolf and wife—Tom Jones—M. F. Polk—Jas. Priest—Ollie Benham Said well to be drilled to and through the Bethel Sand, unless oil or gas in commercial *quantities* is found at a lesser depth.

> "No wells are to be drilled on the 145 acre tract—West of Mrs. Hamilton's barn without consent of lessor."

The printed provisions relative to the payment of the rentals in the event the said development was not completed within the specified time were stricken out,

Jones, in testifying to the circumstances under which he signed the lease, said:

"A. Well, Mr. Bolinger—I wouldn't sign the paper until Mr. Bolinger fixed me up a block. I first wanted the first well, and he said he couldn't give me the first well without consulting the Hoosier Drilling Company, and he came back the next day and said he would give me a well on an adjacent farm. Then he brought the block fixed up, the third time, and specified which individuals—each individual's name in that block.

"Q. What did he say when he gave it to you? A. He said 'That block is made up of these individuals, and we guarantee a well will be started before January 1, 1938, on this block, or it is null and void.'"

It is conceded that Jones had no part in the preparation of the lease and that it was brought to him for his signature with the insertion above referred to, although it is contended by the Company and supported by the testimony of Bolinger that Jones was not concerned with the farms which were to be embraced within the block so long as a number of farms within the general area were included, whereas, Jones testified that he would not have signed the lease unless adjacent lands were included in the block in which drilling was to be begun by January 1, 1938. On December 14, 1937, the Company commenced drilling a well on the C. T. Blackwell tract, and on that date mailed to the owners of the lands on which it held leases the following form letter:

"Dear Sir:

"This is to advise that in accordance with the terms of your oil and gas lease executed in our favor, our drilling rig has been moved to location on the C. T. Blackwell farm, which farm is near the center of the block of which your lease is a part. This location was selected by our geologist after carefully going over the territory and if we should be fortunate enough to bring in a commercial oil or gas well on this location, we have reason to believe that your farm might also be productive.

"We shall be pleased to give you any informa-

tion you desire regarding the progress of the well and suggest you direct your inquiries to this office.

"With good luck we should complete this well in about 75 days.

"Thanking you for your co-operation in making it possible for us to make this test and hoping we may be successful in bringing in a big well for your benefit as well as our own, we are.

"Yours truly,

"Hoosier Drilling Co.

"By E. L. Newton,

"President."

At a depth of 1,539 feet gas was struck, and on April 22, 1938, at a depth of 1,872 feet, an oil well was "brought in" which yielded 1,600 barrels per day. Newton testified that he had "earmarked" the Jones lease and carried it around in his pocket because it was the only short term lease that he had, and around the 30th of December he discovered that the name "C. T. Boswell" had been erroneously inserted in the Jones lease instead of the name "C. T. Blackwell," and that on December 31st or January 1st, he was not certain which, he visited Jones' home, informed him of the error in the lease, and requested an extension of time in which to complete the well which was to be drilled on his land; that Jones admitted that Boswell's name had been inserted instead of Blackwell's by mistake and consented to its correction, and said with regard to the extension of time "Go ahead and drill, let's see how you get along. Any time you are ready to move on me you won't have any trouble with me." However, "he didn't want to put it in black and white," and in response to a suggestion from Mr. Bolinger that the copy should be corrected, said: "He didn't know where the lease was, he was in a hurry—had to leave right away." Newton further testified that on the day after the oil well was brought in he met Jones at the well, and that Jones said: "Congratulations. I guess you will be getting on me right away," And that the witness replied: "Yes, in the next few days," and, "Mr. Jones, don't forget you promised me an extension of time." Bolinger corroborates Newton as to what is alleged to have transpired during the alleged visit of Newton and Bolinger to

Jones' house on December 30th, 31st, or January 1st. Acting on what he understood to be Jones' authority, he erased the word "Boswell" from the Company's copy of the lease, and on the same typewriter which he had used in preparing the lease inserted the name "Blackwell." On April 25th the Company caused the lease with this change in it to be re-recorded in the County Clerk's office, and on April 26th, Jones having heard of the re-recording of the lease and of what he considered to be the fraud perpetrated upon him, decided to have no more dealings with Newton, and closed a contract with the appellee, James C. Ellis, by which he was to receive $5,000 for a lease on the land, $1,000 of which was paid in cash, the remainder to be paid when the title to the land was cleared.

On May 11, 1938, the Hoosier Drilling Company, together with other corporations and individuals to whom it had assigned fractional interests in the Jones lease, instituted this action seeking to enjoin Ellis from drilling and trespassing upon the Jones land, and Jones and his wife from interfering with the appellants in their operations under the lease of June 17, 1937. The petition also contained a prayer that the Ellis lease be cancelled and the lease to the Hoosier Drilling Company be adjudged valid. After demurrers had been overruled, the appellees answered, and by counterclaim sought an adjudication adjudging the Hoosier Drilling Company lease void and the Ellis lease valid. An amended petition was filed, as well as replies, making up the issue, and on June 1, 1938, the Court, after hearing testimony which was transcribed by the official stenographer and made part of the record, overruled the motion of the appellants for a temporary injunction, giving them twenty days within which to appeal to a judge of the Court of Appeals for review. The full Bench of this Court, with the exception of Judge Clay, heard the motion, and on June 24, 1938, overruled it, saying:

"This case is before the writer and other members of the Court on motion for a temporary injunction. It appears that there is an issue of fact involved on which the evidence is conflicting. The circuit court of Henderson County or the judge thereof, refused the temporary injunction upon this conflict of evidence, and upon examination of the

record for ourselves we do not think that we should disturb the order entered by the lower court in refusing the temporary injunction.

"Therefore, the motion for temporary injunction is overruled without an expression of an opinion as to the merits of the case and without prejudice to the rights of the parties to prepare and have the case determined on its merits."

On return of the case to the Circuit Court amended petitions were filed, and the depositions of Jones and C. T. Boswell taken as if under cross-examination. Whereupon, after a trial by agreement on the issues as thus made up and the evidence previously taken, the Chancellor entered a judgment dismissing the petition, adjudging the lease of June 17, 1937 from Jones and wife to the Hoosier Drilling Company void and the lease to Ellis valid, from which judgment this appeal is prosecuted.

Without detailing the various issues made by the pleadings, it is sufficient to say that the controlling questions presented to us for decision are whether C. T. Boswell's name was inserted in the original lease instead of C. T. Blackwell's through mutual mistake of the parties, and if not, whether Jones ratified the alteration, or, by his silence on receipt of the Company's letter of December 14, 1937, or his subsequent statements to the president of the Company, was estopped from taking advantage of the forfeiture incurred by the Company when it failed to commence the drilling of a well prior to January 1, 1938, on property located within the block described in the original lease.

It must be conceded that Bolinger's statement that it was inadvertence which caused him to type "C. T. Boswell" in the original lease immediately following the name "O. L. Boswell" where it was intended to insert the name "C. T. Blackwell" is plausible, and we have not overlooked his testimony that Jones expressly designated Blackwell's farm as one of those to be included in the block, or the testimony, borne out by subsequent events that the Company regarded the Blackwell farm as the most suitable on which to drill the first well, and intended to include it in any specified area in which drilling was required. On the other hand, we have the

unequivocal denial by Jones that he ever mentioned the Blackwell farm, his unequivocal denial that Newton or Bolinger visited his home or had any conversation with him subsequent to the making of the lease or prior to March 1, 1938, or that he was ever informed by either of them of the substitution of Blackwell's name for the name "Boswell," or that he ever consented thereto. His account of the meeting which occurred in March is as follows:

"Q. I believe you said you did not authorize anybody to do it? (Change the lease) A. No, sir, Mr. Newton and Mr. Bolinger came to my house in March, sometime between the 1st and 15th, and asked me to let him make these changes,—he came up and said, 'Mr. Jones, I haven't any lease with you, and we came over here to see if you would let us make some changes,' and I said 'If we don't hit oil we wont need any agreement, or lease, and if we do strike oil, I'll be just as liberal with you as you are with me,' and he says, 'Mr. Jones, that's nothing but a gentleman's agreement.' I said 'That's all right if both parties want to carry it out.'

"Q. Did he tell you what changes he wanted to make? A. Never mentioned them.

"Q. Did he or Bolinger tell you that they had erased the name of 'C. T. Boswell,' and put in the name of 'C. T. Blackwell' in its stead? A. Never mentioned it."

Moreover, there are numerous circumstances which discredit the testimony of Newton and Bolinger, such as the methods pursued in procuring the recording of the lease. Furthermore, in the original petition, verified by the oath of Newton, it was alleged that the mistake in the lease was discovered and corrected on or about *March 15, 1938,* after the well on the Blackwell farm had been drilled to a depth of approximately 1,000 feet. In any event, the testimony for the appellants was not of the clear and convincing character necessary to establish mutual mistake in the inclusion of C. T. Boswell's name instead of the name "C. T. Blackwell," and it was insufficient to establish consent by Jones that the latter's lease be altered. That the alteration without such consent was sufficiently material to avoid the lease is mani-

fest from the fact that without the alteration, the lease on its face had expired on January 1, 1938, through the failure of the Company to commence the drilling of a well on any one of the farms comprising the block described therein. It is, therefore, only necessary to determine the issue raised by the amended petition following the return of the case to the Circuit Court after the motion for a temporary injunction had been overruled, namely, whether Jones, by remaining silent after the receipt of the Company's letter of December 14, 1939, and by subsequent statements to Newton, allowed the Company, to its prejudice, to believe that he considered the original lease to be in full force and effect and would extend its terms further if necessary, and hence was estopped from claiming that the original lease was terminated. At the outset it may be remarked that it is difficult for us to believe that the Company, as it alleges, would have discontinued the drilling of the well on the Blackwell farm, which had already reached a depth of 1,000 feet, if one of the forty-two land owners on whose lands in a promising field the Company held long term leases, had not allowed it to believe that he would extend the time for the drilling of a well on his particular property. It is true that one may be estopped from speaking by having remained silent when it was his duty to speak, and that such estoppel may arise by failure to answer a letter when good morals require an answer in order to prevent the writer of the letter from incurring a risk which he would not have assumed had he not under all the circumstances been justified in the belief that the sendee's failure to answer signified his acquiescence in the statements contained therein. But, as said in the case of Furst & Thomas v. Smith, 280 Ky. 601, 133 S. W. (2d) 941, in which it was held that such an estoppel was created by the failure of the recipient to answer a registered letter, the doctrine is "sparingly applied." See also the opinion of Judge Taft in the case of Morris v. Norton, 6 Cir., 75 F. 912, 924. If the Company's letter of December 14th had informed Jones that it would not continue the drilling of the Blackwell well unless such drilling would be recognized as a compliance with the undertaking of the Company in the Jones lease to begin the drilling of a well within the block before January 1st, or if the Company's officials had relied on Jones' failure to answer as constituting such a recogni-

tion, there would be decided merit in appellants' contention that Jones' failure to answer created an estoppel; but the letter contained no such statement, and the Company's officials did not rely thereon as is shown by their testimony that on or about December 30th, they called on Jones to secure his consent to the correction of the alleged error. Hence, appellants' attempt to invoke the doctrine of estoppel by reason of Jones' failure to answer the letter is wholly unavailing.

Appellants' contention that Jones' statements to the Company's officials subsequent to January 1, 1938, constituted an estoppel or a waiver of the forfeiture, or established that Jones had previously consented to the alteration of the lease, requires but little discussion.

Including Newton, some seven or more witnesses, many of them interested in appellants' success, testified to having met Jones on the Blackwell farm during the course of the drilling subsequent to January 1st, and heard him make statements to Newton which would indicate that he recognized his lease with the Company as valid and subsisting and would permit the Company to commence drilling on the farm in the near future. But there are inconsistencies in some of this testimony which relegate it to the realms, not only of inaccuracy but improbability. In any event, it is not of the character which would justify the nullification of contract rights by the application of the doctrine of estoppel. Jones' version of these occurrences is illustrated by the following excerpts from his testimony. Asked if he made the statements which it was claimed he made while visiting the Blackwell farm after gas had been struck, he said:

"I happened to be at the well that day and ran across that gentleman. He had a map and was showing me the map, and I was anxious to see if there was any of the dome hitting my land, and we were holding the map and I pointed my two places out to him, and he said 'That 49 acres will be plenty hot,' and I said, 'The lease I hold with the Hoosier Drilling Company expires on the 17th day of June,' —I never told anybody about by lease expiring on the 1st day of January,—I was not satisfied with the contract I hold, for the reason it specified one well, but I was going to give Mr. Newton the first

opportunity, and every man that approached me I told them I meant to give Mr. Newton the first opportunity. I never told him anything about I was going to get the first well—he never promised me the first or the second, he told me he—he told me on that lease he was going to bore a well—Mr. Bolinger did—next to me on that lease. It was specific, one was to be completed by the 17th day of June or the lease would be null and void."

Asked if on the Saturday following the bringing in of the oil well on the Blackwell farm he made the statement attributed to him by Newton and some of appellants' witnesses, he said:

"A. It's been turned around considerably from the way I said it. I went to the oil well that Saturday afternoon and went up to look at the oil, had it piped out—I remember going in with Judge Farmer and his wife, and we were talking with different ones, and I congratulated Mr. Newton, and he says: 'Mr. Jones, I am coming right on up to see you,' I said, 'Come ahead, Mr. Newton.'

"Q. Did he say he was going to drill on you? A. No, I knew what he had reference to, and he did too. He knew he didn't have a contract with me, and I told him I would be just as liberal with him as he was with me,—the people around might have construed it the other way."

Many questions of law have been discussed by counsel in the able briefs submitted, and many authorities have been cited treating of the doctrines of "Mistake," "Reformation," "Alteration of Documents," "Ratification," "Estoppel," and kindred subjects; but the principles of law to be applied in this case are so elementary that it is not necessary to discuss them. It is manifest that if a mutual mistake caused the insertion in the lease of the name "C. T. Boswell" where the name "C. T. Blackwell" was intended, or if the mistake was unilateral and its correction was authorized by Jones, Bolinger was within his rights in making the erasure and insertion referred to and the lease did not expire on January 1, 1938, but continued in all events to June 17, 1938. Otherwise, the alteration of the lease voided it, and unless Jones, by his subsequent conduct, estopped himself

from taking advantage of the forfeiture, the appellants are not entitled to relief. Thus it will be seen that the controlling questions in this case are questions of fact which were decided adversely to appellants by the Chancellor who heard the witnesses, observed their demeanor, and doubtless knew their reputations for veracity. We find nothing in the record which would justify us in disturbing his judgment dismissing the petition, and accordingly it is affirmed.

Judgment affirmed.

Whole Court sitting.