INGALLS SHIPBUILDING CORPORA-TION and the American Mutual Liability Insurance, Plaintiffs,

v.

Raymond E. NEUMAN, Deputy Commissioner, United States Employees' Compensation Commission, 7th Compensation District, Defendants,

Mrs. Luieda Belton, as Legal Guardian of Wanda Lynn Wright and Patricia Wright, Minor Children of Patrick Wright, deceased, Intervening Defendant.

Civ. A. No. 3833.

United States District Court,
S. D. Mississippi, S. D.

Dec. 18, 1970.

Eldon L. Bolton, Gulfport, Miss., for plaintiffs.

Robert Hauberg, U. S. Atty., Jackson, Miss., for defendant Commission.

Eaton A. Lang, Jr., Gulfport, Miss., for intervenor.

## OPINION

NIXON, District Judge.

This action is brought pursuant to the provisions of § 21, Longshoremen's and Harbor Workers Compensation Act, 33 U.S.C., § 921, seeking reversal of a compensation order by the defendant, Deputy Commissioner Raymond E. Neuman, awarding benefits to Mrs. Luieda Belton, on behalf of two minor children, Wanda Lynn Wright, and Patricia Jackson Wright, resulting from the death of Patrick Wright, an employee of Ingalls Shipbuilding Corporation.

The operative facts of this case as found by the Deputy Commissioner are, with minor exceptions, undisputed between the parties and may be summarized as follows. In about the year 1951 or 1952, the deceased employee Patrick Wright and Virginia Freeman Jackson, the legal wife of George Jackson of Birmingham, Alabama, began living together as man and wife, initially in Camden, Alabama, and thereafter in Lucedale, Mississippi. This relationship continued until the death of Virginia Freeman in March of 1966. During this approximately 15 year period, Virginia Freeman gave birth to two minor children involved herein, Patricia Jackson Wright, born March 12, 1954 and Wanda Lynn Wright, born June 5, 1962. Following the death of Virginia Freeman, the deceased employee, having no family of his own, arranged with Mrs. Luieda Belton, the sister of Virginia Freeman and claimant herein, for the two children to live with her in Bessemer, Alabama. There was an agreement between the decedent and Mrs. Belton that he would send $20.00 per week for the support of the two children. Although this financial commitment was largely dishonored by the decedent who contributed only $44.00, $24.00 of which went to Patricia individually, during the following 18 month period, he repeatedly informed Mrs. Belton that the promised financial assistance would be forthcoming. The decedent did not at any time, visit the children in Bessemer, Alabama, but did have them with him for approximately four weeks in Lucedale, Mississippi during the summer of 1967.

On September 27, 1967 Patrick Wright, while performing services for his employer, plaintiff herein, upon navigable waters of the United States, fell approximately 40 feet while descending a ladder within a vessel. This accident resulted in multiple fractures of his head and upper extremities, causing instantaneous death.

Thereafter, a claim was filed by Mrs. Luieda Belton, as legal guardian of the two minor children, which claim was denied by Ingalls Shipbuilding Corporation and its carrier, American Mutual Liability Insurance Company. The case was thereafter heard on September 30, 1969 in Birmingham, Alabama, before the defendant, Raymond E. Neuman, Deputy Commissioner for the 7th Compensation District.

The Deputy Commissioner determined that the two children in question were

born of the decedent, Patrick Wright, and Virginia Freeman. It was his further determination that because at the inception of this relationship Virginia Freeman was legally married to George Jackson, and there was no evidence that this marriage had ever been dissolved, the two children were not the legal children of the decedent. Notwithstanding the absence of a legal relationship between the decedent and the two children, the Deputy Commissioner determined that the children did fall within the definition of "child" under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 902(14), and were thereby entitled to benefits at the aggregate rate of $52.50 per week (50% of $105.00, the maximum average weekly wage upon which death benefits may be computed, 35% to the first child, 15% to a second child, share and share alike), beginning September 27, 1967, the date of the employment related injury resulting in death, and continuing subject to the limitations of the Act.[1]

The Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 902(14), defines child as follows:

"(14) 'Child' shall include a posthumous child, a child legally adopted prior to injury of employee, a child in relation to whom the deceased employee stood in loco parentis for at least one year prior to the time of the injury, and a stepchild or acknowledged illegitimate child dependent upon the deceased, but does not include married children unless wholly dependent on him."

The question before this Court is whether there is substantial evidence in the record to support the Deputy Commissioner's finding that Patricia Wright and Wanda Lynn Wright are "surviving children" of the decedent, Patrick Wright, as that term is defined under the Act. Accordingly, under the facts of this case, these children must either be shown to be acknowledged illegitimate children of the decedent or "children in relation to whom the decedent stood in loco parentis for at least one year prior to the time of the injury."

This Court is fully aware of the standard to be applied in determining whether there was adequate evidence in the record to support the findings of the Deputy Commissioner. This standard was well expressed by the Supreme Court in O'Keeffe v. Smith, Hinchman & Grylls, 380 U.S. 359, 362, 85 S.Ct. 1012, 1014, 13 L.Ed.2d 895 (1965), as follows:

"The rule of judicial review has therefore emerged that the inferences drawn by the Deputy Commissioner are to be accepted unless they are irrational or 'unsupported by substantial evidence on the record * * * as a whole.'" (380 U.S. at 362, 85 S.Ct. at 1014).

It is therefore immaterial that this Court may not have drawn the same inferences or reached the same conclusions as the Deputy Commissioner, provided his findings are supported by "substantial evidence."[2] This Court will not substitute

---

1. 33 U.S.C. § 909 reads: "If the injury causes death, the compensation shall be known as a death benefit and shall be payable in the amount and to or for the benefit of the persons following:

(b) If there be a surviving wife or dependent husband and no child of the deceased, to such surviving wife or dependent husband 35 per centum of the average wages of the deceased, during widowhood, or dependent widowerhood, with two years' compensation in one sum upon remarriage; and if there be a surviving child or children of the deceased, the additional amount of 15 per centum of such wages for each such child;

(e) In computing death benefits the average weekly wages of the deceased shall be considered to have been not more than $105 nor less than $27 but the total weekly compensation shall not exceed the weekly wages of the deceased."

2. O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 507, 508, 71 S.Ct. 470, 95 L.Ed. 483 (1950); Mississippi Shipping Co. v. Henderson, 231 F.2d 457, 460 (C.A. 5, 1956); Banks v. Chicago Grain Trimmers Assn., 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968).

its own judgment or disturb inferences properly drawn by the Deputy Commissioner.[3]

■ At the outset, the initial question is whether state or federal law should be applied in determining the meaning of the term "child" as defined by Paragraph (14) of § 2 of the Act, 33 U.S.C. § 902(14). In considering the definition of the term "next of kin" as used in the Federal Employers Liability Act, 45 U.S.C. § 51, the Supreme Court, in Seaboard Air Line R. Y. v. Kenney, 240 U.S. 489, 36 S.Ct. 458, 60 L.Ed. 762 (1916), stated:

> "There can be now no question that the act of Congress in so far as it deals with the subjects to which it relates is paramount and exclusive. It is therefore not disputable that recovery under the act can be had alone in the mode and by and for the persons or class of persons in whose favor the law creates and bestows a right of action. * * * But this is irrelevant, since the controversy concerns only the meaning of the act, which it is conceded, when rightly interpreted, is entitled to exclusive operation.

> "Plainly the statute contains no definition of who are to constitute the next of kin to whom a right of recovery is granted. But, as speaking generally under our dual system of government, who are next of kin is determined by the legislation of the various states to whose authority that subject is normally committed, it would seem to be clear that the absence of a definition in the act of Congress plainly indicates the purpose of Congress to leave the determination of that question to the state law. But, it is urged, as next of kin was a term well known at common law, it is to be presumed that the words were used as having their common-law significance, and therefore as excluding all persons not included in the term under the common law; meaning, of course, the law of England as it existed at the time of the separation from the mother country. Leaving aside the misapplication of the rule of construction relied upon, it is obvious that the contention amounts to saying that Congress, by the mere statement of a class, that is, next of kin, without defining whom the class embraces, must be assumed to have overthrown the local law of the states, and substituted another law for it; when conceding that there was power in Congress to do so, it is clear that no such extreme result could possibly be attributed to the act of Congress without express and unambiguous provisions rendering such conclusion necessary. The truth of this view will be made at once additionally apparent by considering the far-reaching consequence of the proposition, since, if it be well founded, it would apply equally to the other requirements of the statute,—to the provisions as to the surviving widow, the husband and children, and to parents, thus, for the purposes of the enforcement of the act overthrowing the legislation of the states on subjects of the most intimate domestic character and substituting for it the common law as stereotyped at the time of the separation. The argument that such result must have been intended, since it is to be assumed that Congress contemplated uniformity, that is, that the next of kin entitled to take under the statute should be uniformly applied in all the states, after all comes to saying that it must be assumed that Congress intended to create a uniformity on one subject by producing discord and want of uniformity as to many others." (240 U.S. at 493, 494, 36 S.Ct. at 459–460).

In Ellis v. Henderson,[4] the Court of Appeals for the Fifth Circuit in consid-

3. Delta Steamship Lines, Inc. v. Donovan, 356 F.2d 940 (C.A. 5, 1966); Henderson v. Pates Stevedoring Co., 134 F.2d 440 (C.A. 5, 1943).

4. 204 F.2d 173 (C.A. 5, 1953), cert. den., Marine Welding, Scaling & Sales, Co. v. Ellis, 346 U.S. 873, 74 S.Ct. 123, 98 L.Ed. 381 (1953).

ering the meaning of the term "child", as defined by the Longshoremen's Act, noted that "insofar as the definition in the federal statute is complete in itself it controls", citing Weyerhaeuser Timber Co. v. Marshall, 102 F.2d 78, 81 (C. A.9, 1939). Based on the reasoning of the *Kenney* case, however, the Court then turned to the laws of the State of Louisiana in order to determine the status of the subject children.

The Fifth Circuit recently reaffirmed the determination reached in Ellis v. Henderson, *supra,* noting that in construing the term "child" or "children" under a federal statute, courts overwhelmingly look to state law. Murphy v. Houma Well Service, 409 F.2d 804 (C.A.5, 1969). The Court further noted that the Second Circuit case of Middleton v. Luckenbach S.S. Co., 70 F.2d 326 (C.A.2, 1934), perhaps suggesting contrary results, was distinguishable, and stated: "Whether Middleton is really at odds with our view we need not decide, for if it is we decline to follow it." 409 F.2d at 811.

It is the contention of the appellants that a finding that the minor children, Patricia Wright and Wanda Lynn Wright, were the acknowledged illegitimate dependent children of the deceased employee, Patrick Wright, is not supported by substantial evidence in the record. This definition of the term "child" under the Act is threefold and necessitates the examination of each of the elements separately, although they are certainly interrelated.

■ The plaintiff strenuously urges this Court to reject the finding of the Deputy Commissioner in that the claimants herein have failed to overcome the universally recognized presumption of legitimacy in favor of children born in wedlock. This presumption of legitimacy, which is characterized as the strongest presumption known to law, is adhered to

in the State of Mississippi and can be rebutted only by a showing that the legal husband of the mother was either incapable of procreation or had no access to the mother at a time when the child could have been begotten. Stone v. Stone, Miss., 210 So.2d 672, 674 (1968).

It is the contention of the defendant and intervenor that the issue of the paternity of these two children was not raised before the Deputy Commissioner, and this Court should not allow the injection of the issue at this stage of the proceedings. Furthermore, it is contended that the evidence presented to the Commissioner proved unequivocally and beyond any reasonable doubt that Patrick Wright was the biological father of the two children.

■ It is well established that an issue, in order to be considered upon judicial review of a compensation order, must first have been raised before the Deputy Commissioner, and failure to do so will constitute a waiver thereof.[5] In the case of Maryland Casualty Co. v. Cardillo, 71 App.D.C. 160, 107 F.2d 959 (1939), the appellant, insurance carrier for the employer, contended that there was no evidence that the claimant was the wife of the deceased employee. After noting the strong presumption that a compensation claim falls within the provisions of the Act and the failure of the appellant to contradict the sworn statement of the claimant that she was married to the decedent, the Court stated:

"The appellant, though it asked that a marriage certificate be filed, did not dispute the fact of marriage at any stage of the proceedings before the deputy commissioner. On the contrary, appellant's counsel stated that the claim to compensation was controverted on four grounds, which he named. None of them had any relation to marriage, and it cannot be questioned now." Citing Metropolitan

---

5. Parker v. Motor Boat Sales, Inc., 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184 (1941); Bethlehem Steel Co. v. Parker, 163 F.2d 334 (C.A. 4, 1947); Britton v. Great American Indemnity Co., 110 U.S.

App.D.C. 190, 290 F.2d 381 (1961), cert. den. 368 U.S. 900, 82 S.Ct. 178, 7 L.Ed. 2d 95; Globe Indemnity Co. v. Calbeck, 230 F.Supp. 14 (S.D.Tex.1960).

Casualty Insurance Co. v. Hoage, 67 App.D.C. 54, 89 F.2d 798 (1937).[6]

This Court has carefully reviewed the record and is convinced that the children's natural relationship to the decedent, Patrick Wright, was assumed by all parties throughout the proceedings before the Deputy Commissioner. It is significant to this Court that the strong presumption in favor of legitimacy of children born in wedlock and the necessary proof to overcome such a presumption, was not even mentioned by counsel for the plaintiff at the hearing. In the examination of Mrs. Belton, plaintiff's counsel did not attempt, except perhaps in an incidental way, to contradict her unequivocal statement that Patrick Wright was the father of the two children. Furthermore, throughout the proceedings before the Deputy Commissioner, plaintiff's counsel continuously and repeatedly referred to the deceased employee as the "father" or "daddy" of these children.[7]

In stating its case before the Deputy Commissioner, the counsel for the plaintiff, Ingalls, stated:

"And in particular, they do not come under the purview of a child sustaining the relation of loco parentis for the reason that for more than one year before the death of Mr. Wright, they were not in the same home with him or under any parental control. And further, that if they were acknowledged illegitimate children *which is not admitted*, that they were not in fact dependent upon the deceased at the time of death, as provided in § 2, subparagraph 14 of the Act." (Tr. of Hearing, p. 14) Emphasis supplied.

 It is the contention of the plaintiff that the underlined portion of the

above quoted language was sufficient to have raised the paternity issue before the Deputy Commissioner. This Court is of the opinion that the language "which is not admitted" was intended to be applicable only to the acknowledged element of the definition, the illegitimacy of the children being accepted. This view is strengthened by the fact that Mrs. Belton was examined by the plaintiffs strictly on the questions of acknowledgement, dependency and "in loco parentis." In any event, this Court is of the opinion that this bare negation alone was certainly not sufficient to raise the issue of paternity before the Deputy Commissioner. The evidence is too overwhelming that the plaintiffs are attempting at this stage of the proceedings to assert, for the first time, that the children were not the offspring of the decedent, Patrick Wright.

Not only did the plaintiff fail to introduce any evidence concerning the legitimacy or illegitimacy of these two children, but it did not attempt contradiction of the evidence presented by the claimant on the question of paternity. Section 20(a) of the Act, 33 U.S.C. § 920(a) provides:

"§ 20 In any proceeding for the enforcement of a claim for compensation under this Act it shall be presumed, in the absence of substantial evidence to the contrary * * *

(a) that the claim comes within the provisions of this act."

If this provision has any meaning whatsoever, it certainly requires the party opposing a claim to take some affirmative action to place in issue an essential element which is seemingly undisputed. This is particularly true, under the circumstances of this case, where

---

6. In Metropolitan Casualty Co. v. Hoage, *supra*, the issue of non-liability for failure to assent to compromise was raised for the first time upon appeal. The Court noted: "It is likely that if the point now raised had been urged at the hearing, abundant evidence would have been forthcoming showing that the compromise of the damage suit was made

with the approval and at the instance of the carrier. This in itself is sufficient to justify us in invoking the rule that a question of this character cannot be raised for the first time in court." 89 F.2d at 800.

7. Transcript of Hearing, pp. 36, 37, 40, 42.

it is obvious that all parties were proceeding under the assumption that the paternity of these children was not in question.

■ Assuming, however, that the paternity issue was properly raised and is now before the Court, this Court is of the opinion that the record reveals that Patrick Wright was the father of these two children. The most recent enunciation of the proof necessary under Mississippi law to overcome the presumption of legitimacy of children born in wedlock is found in the case of Stone v. Stone, 210 So.2d 672, 674 (1968):

"The important question in this case is whether the trial court erred in declaring the child, Lisa Kelly Stone, was not the child of appellee and thereby declaring her illegitimate and thereby refusing to require appellee to support this child. The child was born in wedlock and as a matter of public policy the law presumes her to be legitimate. This presumption is said to be the strongest presumption known to law and it continues until it is shown that the husband is incapable of procreation or that he had no access to his wife at a time when the child could have been begotten. Moore v. Smith, 178 Miss. 383, 172 So. 317 (1937); Herring v. Goodson, 43 Miss. 392 (1870). We hold that the presumption that a child conceived and born during wedlock is legitimate is so strong that a husband who charges that a child born to his wife was begotten by another has the burden of proving beyond a reasonable doubt that he is not the father. Ordinarily, the 'reasonable doubt' measure of proof is restricted to criminal cases, but we have heretofore made an exception to this rule in cases involving the reformation of written instruments. We have held in a number of cases that proof beyond a reasonable doubt is required in order to sustain the reformation of a written instrument. Continental Oil Co. v. Walker, 238 Miss. 21, 117 So.2d 333 (1960); American Alliance Ins. Co. v. Alford,

229 Miss. 855, 92 So.2d 191 (1957); Progressive Bank of Summit v. McGehee, 142 Miss. 655, 107 So. 876 (1926). Certainly public policy demands that a child born in wedlock should not be branded as illegitimate except in those cases where the proof is so strong that there is no reasonable doubt that the husband is not the father. Nothing less will suffice." 210 So.2d at 674.

In order to complete the treatment afforded the presumption of legitimacy by the Mississippi courts, the following language from the case of Boone v. State, 211 Miss. 318, 51 So.2d 473 (1951) is quite pertinent:

"In the case of Herring v. Goodson, 43 Miss. 392, the Court said: 'A child born after the marriage, and during the husband's life, is presumed to be legitimate; and so firm was this presumption originally, that it would not be rebutted, unless the husband was incapable of procreation, or was absent beyond the four seas during the whole period of the wife's pregnancy. Co. Litt. 244a; Rex v. Albertson, 1 Lord Ray, 395; Rex v. Murray, 1 Salk., 121. This ancient rule has been so far relaxed, that in later times, this presumption may be overcome by showing that the husband had no opportunity for intercourse, and the jury, from all the facts, are to infer whether intercourse did or did not take place. Banbury v. Gardner, Peerage cases; Rex v. Luffe, 8 East 173; State v. Petteway [Pettaway, 10 N.C. 623], 3 Hawks 623] 1 Phil.Evi., 630. * * *

"The rule announced in Wharton's Criminal Evidence, 11th Edition, Vol. 1, Section 101, page 119, is as follows: 'The presumption of legitimacy formerly prevailed as a conclusive presumption, except in the case of impotency and absence, as to all persons living in civilized countries; but this has been modified so that the rule now is that the presumption of legitimacy obtains from the birth of a child during marriage, subject to rebuttal by evidence which clearly and conclusive-

ly shows that legitimacy was impossible under the circumstances. A child born in wedlock before any judicial separation of his parents is presumed to be their legitimate child no matter how soon the birth be after the marriage, though this presumption, which is one to which the law attaches great force, may be overcome by strong proof that the husband was incapable, on ground either of impotence or absence, of being the father of the child, or by other evidence showing extreme improbability of sexual intercourse. When access is proved, peculiarly strong evidence of non-intercourse is required to justify a judgment of illegitimacy. The weight of authority is to the effect that, where an opportunity for sexual intercourse is shown, the presumption of legitimacy may be rebutted by proof that intercourse did not, in fact, take place.' " 51 So.2d at 475, 476.

There is absolutely no evidence in this record to indicate that George Jackson was incapable of procreation. The rebuttal of the presumption of legitimacy thus required a showing, beyond a reasonable doubt, that George Jackson had no access to Virginia Freeman at a time when either or both of these children could have been begotten.

This Court has carefully reviewed the Mississippi cases dealing with the presumption of legitimacy and the evidence necessary to prove non-access, and is unable to discover a case with sufficient factual similarity to compare with the case sub judice.[8] In Moore v. Smith, 178 Miss. 383, 172 So. 317 (1937), a filiation proceeding in which the appellant, the mother therein attempted but was not permitted by the lower court, to prove by the testimony of herself and the legal father, that they had separated in 1928, she remaining in Mississippi and the legal husband moving to Louisiana, where each had continuously

remained, thereby rendering access between them impossible. The mother sought, through that proceeding, to charge the appellee therein with the support of her child, alleging that he was the actual father. The child was born in 1935. The Mississippi Supreme Court, in reversing the trial court, determined that domestic and social policy did not require the exclusion of the testimony of the mother and legal husband, and in fact, justice would be best promoted by admitting such evidence. In the *Moore* case, in addition to the evidence excluded, there had been evidence by the appellant's mother that the husband had no access to the appellant during the required period.

Unfortunately, in the case at bar, the children's deceased mother cannot testify to non-access. Likewise, the record does not reveal the present whereabouts of George Jackson or his availability to testify in this case. Furthermore, the weight to be afforded his testimony, if he were available, is extremely speculative in that a declaration of access would be an admission against interest in that he may then be subjected to his legal obligation to support the children. Finally, the Deputy Commissioner did not have the benefit of the live testimony of the decedent concerning the access or non-access of George Jackson to Virginia Freeman during the 15 years in which they cohabited together as man and wife.

This Court is of the opinion, however, that the proof which was presented to the Deputy Commissioner concerning the paternity of these two children was sufficient to prove beyond a reasonable doubt that Patrick Wright was their biological father. Mrs. Belton testified that Patrick Wright and Virginia Freeman lived together from 1952 until the time of her death in 1966; that the two children were born during this time; that Patrick Wright was their father; that they had lived with their parents

---

8. Herring v. Goodson, 42 Miss. 392, (1870); Moore v. Smith, 178 Miss. 383, 172 So. 317 (1937); Graham v. Lee, 204 Miss. 416, 37 So.2d 735 (1947); Boone v. State, 211 Miss. 318, 51 So.2d 473 (1951); Stone v. Stone, 210 So.2d 672 (1968).

from the moment they were born until the mother died. Mrs. Belton further testified that Virginia Freeman and Patrick Wright had left Birmingham, Alabama, where she and George Jackson had lived, in 1952 and had never returned to Birmingham, having lived together for three years in Camden, Alabama, and 11 years in Lucedale, Mississippi. She also testified that she visited the minor children with their parents in Camden and Lucedale at least once or twice each year and that Patrick Wright always acknowledged to her and to the general public that these children were his. (Tr. of Hearing, pp. 15, 16, 31, 35).

Although this Court will hereinafter discuss the Deputy Commissioner's finding of acknowledgement of these two children by the decedent, suffice it to say that it is certainly supported by substantial evidence in the record. Acknowledgement of paternity by the decedent during his lifetime can certainly be afforded some weight in determining whether the presumption of legitimacy has been overcome. It is contrary to human experience for a man to continue to cohabit with a woman for 15 years and publicly and privately acknowledge as his the two children born during this period, if he entertains any doubt that she and her former husband are continuing their relationship through access and sexual intercourse.

Finally, the testimony reflects that the Social Security Administration determined that the decedent was the father of the two minor children, awarding $143.40 per month in Social Security benefits for their care. (Tr. of Hearing, pp. 26, 27, 28).

This Court notes that Mrs. Belton testified to having subsequently changed the birth certificate of the child Patricia, previously denoting Patricia Jackson, in order 'to show that Patrick Wright was the daddy" and "to get * * * the names really brought out correctly." (Tr. of Hearing, p. 34). Although the original status of the birth certificate is certainly entitled to consideration on this question, its effect is clearly outweighed by the evidence outlined hereinabove.

The plaintiffs place heavy reliance upon three cases decided by the Court of Appeals for the Fifth Circuit in which the laws of Louisiana were determinative on the question of the status of the minor children involved therein. In Ellis v. Henderson,[9] the factual situation was exactly reversed from the case sub judice in that the deceased employee was the husband rather than the man with whom the mother had been living. The two children in that case had been universally recognized as the children of the man with whom the mother had illegally cohabited for a number of years, and had been registered as such. The Deputy Commissioner denied the claim for compensation filed on behalf of children and this determination was upheld by the U. S. District Court for the Eastern District of Louisiana. The Fifth Circuit, however, reversed this judgment, stating that the word "child" means "not a mere biological fact but a relationship sanctioned by the law."

The Court in *Ellis* noted the strong presumption of legitimacy of children born in wedlock and that this presumption was rebuttable only by a showing of physical impossibility which, under Louisiana law, required proof that the residences of the husband and wife were so remote from each other that access was impossible. (citing Feazel v. Feazel, 222 La. 113, 62 So.2d 119).[10] Although

9. 204 F.2d 173 (C.A.5, 1953) cert. den. Marine Welding, Scaling & Sales Co. v. Ellis, 346 U.S. 873, 74 S.Ct. 123, 98 L.Ed. 381 (1953).

10. The language of the Court of Appeals of Louisiana for the Fourth Circuit in Gillies v. Gillies, 144 So.2d 893, 896 (1962) illustrates the desire of the courts to prevent determinations which are contrary to obvious biological facts, the Court stating: "Our courts have interpreted this Article to mean remoteness in distance. In this day and time there is no such thing as remoteness in distance as our means of transportation

in *Ellis* both the legal husband and mother had cohabited with a person of the opposite sex in an illegal relationship for a number of years, they had continued to live in the same neighborhood.

The second basis for the decision in *Ellis, supra,* was the fact that the Louisiana courts had determined that a defendant in a suit for compensation under the Louisiana Compensation Statute could not attack a child's paternity if no action had been brought to disavow such child within the period of time prescribed by Louisiana law. The Court noted that "if a man can make himself legally the father of a child by adoption or by acknowledgement of one illegitimate, we see no reason why he cannot do so by failing to disavow paternity of his wife's child within the time allowed by law." 204 F.2d at 177.

In Henderson, et al. v. Avondale Marine Ways, Inc., 204 F.2d 178 (C.A.5, 1953), a case involving the same question raised in *Ellis,* the Court, while finding that the mother therein was accessible to the lawful husband at all times, although there was dispute as to the continuation of sexual intercourse, noted that "the paternity of the deceased husband of the mother of the children cannot now be attacked. The reasons for that conclusion have been sufficiently stated in Ellis v. Henderson, 5 Cir., 204 F.2d 173."

In the case of Murphy v. Houma Well Service, et al., 409 F.2d 804 (C.A.5, 1969), the deceased employee and the mother of the subject children therein were married in 1959 but remained together for only one month. In 1961 and 1962, while living with another man, the mother gave birth to the two children

seeking recovery under the Act to the exclusion of the decedent's sole surviving parent, his mother.

In affirming the allowance of benefits to the two minor children, the basis on which the court rested its decision is quite significant in distinguishing it, as well as *Ellis, supra,* and *Henderson, supra,* from the case at bar:

"As the presumption of legitimacy is clearly applicable here, we come, then, to the question of determining its conclusiveness on the parties before the Court. The Civil Code provides generally that in cases in which the presumption is subject to attack, the presumed father, if he intends to dispute legitimacy, must institute an action to disavow paternity * * * within a prescribed period after the child is born or after he discovers its existence. Likewise, if the husband dies without having disputed legitimacy, his heirs are given a short time to make objection to the status of the child. In the instant case, however, neither Edward Fontenot nor his mother resorted to the procedure afforded by statute.

\* \* \* \* \* \*

"Accordingly, since neither Edward Fontenot nor his mother (and heir), Mrs. Eva Fontenot, instituted the requisite statutory procedures, under state law Romona Gail is conclusively presumed to be the child of Edward Fontenot. As his child, she is the statutory beneficiary under the Jones Act and is entitled to whatever recovery might be had for his death."

409 F.2d at 804.

is much faster than it was at the time the Civil Code was written. The astronauts are going around the world at least three times within a very few hours and by way of the Super Jets and other means of transportation, most any place on the face of the earth can be reached from any other place within a matter of a few days or hours. Unless we can use Webster's New 20th Century Dictionary to interpret our Code as revised in 1950, remoteness means distance in

human relations and aloofness such as remote and cold in his manner. The aloofness and coldness of either party makes the remoteness of the husband from the wife such that cohabitation is a physical impossibility." The Court notes the subsequent explanation of this language in the case of Lewis v. Powell, La.App., 178 So.2d 769, 772 (1965), and the lack of a clear relaxation of the rule interpreting remoteness to mean physical distance.

■ By contrast, the laws of Mississippi do not make the presumption of legitmacy irrebuttable upon the failure of the deceased or his heirs to disavow paternity within a specified period of time. The presumption may be rebutted upon a showing of non-access.

Upon rehearing in Murphy v. Houma Well Service, 413 F.2d 509 (C.A.5, 1970), the Court noted that the mother of the deceased employee was denied the right to show the true "biological fact" in that case only because the Court had ruled that the proof would have no effect on the outcome. Under Louisiana law, the proper method for challenging the presumption and proving the true "biological fact", was through an action to disavow. The Court further held that Mrs. Fontenot was not denied due process and equal protection under the law resulting from Louisiana's conclusive presumption of legitimacy upon her failure, or that of her son, to avail themselves of the disavowal mechanism.

It is thus the opinion of this Court that the claimant herein has presented sufficient evidence to show the true paternity of these two children and the non-access of George Jackson. The Deputy Commissioner's determination that they were born of the relationship between the deceased employee and their mother, Virginia Freeman, is supported by substantial evidence. To hold otherwise would be to ignore the breadth of the statute's definitional structure requiring liberal construction in favor of coverage and would produce "the harsh and incongruous result" condemned in O'Keeffe v. Atlantic Stevedoring Company, 354 F.2d 48 (C.A.5, 1965). See also Texas Employers' Insurance Association v. Shea, 410 F.2d 56, 59 (C.A.5, 1969).

■ The second question to be considered by this Court is whether there is substantial evidence in the record to support the Deputy Commissioner's determination that the two children were acknowledged by the decedent. As heretofore noted, Mrs. Belton testified that she had visited the minor children and their parents at Camden, Alabama and Lucedale, Mississippi at least once or twice a year, and that Patrick Wright always acknowledged to her and to the general public that they were his. (Tr., pp. 31, 33, 36). In addition, the 1966 income tax return of Patrick Wright, admitted into evidence at the hearing, reflects that he claimed the two children as his daughters. (Ex. 3; Tr. of Hearing, p. 32). The claimant attempted to introduce four affidavits from citizens of the Lucedale Community to the effect that Patrick Wright publicly acknowledged that he was the father of these two children, but plaintiff's objection to their admission was sustained on the ground that they constituted hearsay, inasmuch as there would be no opportunity to cross examine the affiants. Although this Court is of the opinion that the affidavits are unnecessary to support the findings of the Deputy Commissioner of acknowledgement by Patrick Wright, their admission for the purpose offered would not have prejudiced the plaintiff's under the circumstances of this case. In the case of Texas Employers' Insurance Association v. Shea, 410 F.2d 56 (C.A.5, 1969), the employer's insurer argued that the child, being "en ventre sa mere" at the time of her father's death, could not have been acknowledged by him. The Court stated:

"The record shows that Rose Grizzaffi Clark [mother therein] cohabited with the deceased for four months before his death and that Rose was four months pregnant at the time of his death. This is sufficient evidence to support the Deputy Commissioner's finding that Clifford knew Rose was pregnant. Since acknowledgement of paternity does not require a notary seal or any other ritualistic proclamation, we hold that Clifford's continued cohabitation with Rose with knowledge of her pregnancy justifies the almost inescapable inference that he acknowledged Elizabeth Marie before his untimely death." 410 F.2d at 61.

In the case sub judice, not only did the deceased employee continue to cohabit

with the mother during her pregnancies but continued to reside with the mother and the children from their birth until the death of the mother in March, 1966, which in the case of Patricia Wright is a total of 12 years, and in the case of Wanda Lynn Wright, a total of four years.

This Court is thus of the opinion that the Deputy Commissioner's determination that these minor children were acknowledged by the decedent, Patrick Wright, is supported by substantial evidence in the record.

■ The third question which must be examined by this Court is the sufficiency of the evidence to support a finding of dependency. Under the Longshoremen's Act an acknowledged illegitimate child is required to prove dependency in order to recover benefits resulting from the death of his father. On the other hand, a legitimate or adopted child is conclusively presumed to be dependent upon his father.[11]

■ Certainly it must be conceded that the decedent, Patrick Wright, having fathered these two children, was under a moral obligation to provide for their support. Likewise, it is clear that the arrangement the decedent made with Mrs. Belton whereby he would send at least $20.00 per week for the support of the two children in return for her care and maintenance was a binding agreement. The cases are legion in support of the proposition that such an agreement is enforceable and is supported by sufficient consideration.[12] Furthermore, the father of a child born out of lawful matrimony, including a child born to a married woman by a man other than her lawful husband, is liable to the same extent as the legal father of a child for the necessary support and maintenance of the child. Mississippi Code of 1942, Rec., § 383–01.[13] In the case of Hewett v. Garrett, 1 N.C.App. 234, 161 S.E.2d 157 (1968), the Court, in construing language identical to that contained in § 2(14) of the Longshoremen's Act, determined that dependency refers to obligatory legal dependency, rather than factual dependency. Since the deceased employee was under a legal obligation to support his illegitimate daughter in that case, she was determined to be entitled to death benefits as his dependent under the State Compensation Law.

This Court, having carefully reviewed the Mississippi case law concerning dependency under this State's Workmen's Compensation Act, which contains language identical to that under consideration herein (i. e., "acknowledged illegitimate child dependent upon the deceased"),[14] is of the opinion that, standing

11. Maryland Dry Dock Co. v. Parker, 37 F.Supp. 717 (D.C.Md.1941); Turnbull v. Cyr, 188 F.2d 455 (C.A.9, 1951); Ellis v. Henderson, 204 F.2d 173 (1953).

12. Todd v. Weber, 95 N.Y. 181; Easly v. Gordon, 51 Mo.App. 637; Ronk v. Ronk, 322 Mich. 43, 33 N.W.2d 655 (1948); Ippolito v. Terragni, 140 Misc. 606, 251 N.Y.S. 374 (1931); Wiggins v. Keizer, 6 Ind. 252 (1855); Trovinger v. M'Burney, 5 Cow. 253 (1825).

13. Paternity under this Act may be determined upon petition of the mother, the child, "or any public authority chargeable by law with the support of the child." Proceedings cannot be instituted by the mother, however, after the child has reached the age of one year, unless the defendant is absent from the state or has acknowledged in writing that he is the father. The father's liabilities for past necessary support and maintenance are limited to a one year period preceding the commencement of an action. In order to hold the estate of the father liable under the Act, an action must be commenced during the lifetime of the father. Miss.Code of 1942, Rec. §§ 383–02, 383–03, 383–04. This Act applies to children born before or after its effective date. Dunn v. Grisham, 250 Miss. 74, 157 So.2d 766 (1963).

14. Section 6998–02(12), Mississippi Code of 1942, Rec., provides:

"(12) 'Child' shall include a posthumous child, a child legally adopted prior to the injury of the employee, a child in relation to whom the deceased employee stood in the place of a parent for at least one year prior to the time of injury, and a stepchild or acknowledged illegitimate child dependent upon

alone, a moral and legal obligation to support is insufficient to uphold a finding of dependency. In the case of Stanford v. Stanford, 219 Miss. 236, 68 So.2d 275 (1953), the Supreme Court of Mississippi, in affirming the judgment of the lower court denying the claim of an illegitimate child of the deceased upon a finding of nondependency, treated this issue as follows:

"'Dependency in fact must be established in order to qualify for death benefits in all cases except those involving a conclusive presumption of dependency.' Larsons Workmen's Compensation Law, par. 63.00.

"The appellant's attorneys argued that there was a legal and moral obligation on the part of the deceased to support the child; and this may be true. But the statute clearly indicates that, in the case of an acknowledged illegitimate child, the proof must show that the child was dependent in fact upon the deceased.'

"*On the precise issue whether the legal obligation to support can alone ground a finding of dependency, the general rule is that it cannot. 'There must be either actual support or some reasonable expectation that the legal obligation will be met.'* Larsons Workmen's Compensation Law, par. 63.31. The proof in this case showed that the

child had never received any financial support from the deceased; and it is clear that there was no reasonable expectation that such support would be provided in the future." (Emphasis supplied)

A review of Mississippi cases reveals uniform adherence to the necessity of demonstrating factual dependency in order for acknowledged illegitimates to recover compensation benefits. See Fernwood Industries, Inc. v. Mitchell, 219 Miss. 331, 68 So.2d 830 (1953); Stanley v. McLendon, 220 Miss. 192, 70 So.2d 323 (1954).

Thus, this Court is of the opinion that under Mississippi law, a finding of dependency requires more than the determination of the mere existence of a legal obligation to support.[15] The contractual obligation to support the children, voluntarily entered into by the decedent, and the liability imposed under the Mississippi Uniform Act on Paternity upon the decedent to provide necessary support and maintenance, enforceable during his lifetime upon a determination of paternity,[16] are certainly evidentiary factors which must be considered and weighed along with all the other evidence in determining whether dependency in fact has been established.

In the case of Fernwood Industries, Inc. v. Mitchell, *supra*, the Mississippi

---

the deceased, but does not include married children unless wholly dependent on him. 'Grandchild' means a child as above defined of a child as above defined. 'Brother' and 'Sister' includes stepbrothers and stepsisters, half brothers and half sisters, and brothers and sisters by adoption, but does not include married brothers nor married sisters unless wholly dependent on the employee. 'Child,' 'grandchild,' 'brother' and 'sister' include only persons who are under eighteen (18) years of age, and also persons who, though eighteen (18) years of age or over, are wholly dependent upon the deceased employee and incapable of self-support by reason of mental or physical disability."

15. This finding obviates the necessity of determining whether the oral contract between Patrick Wright and Mrs. Belton

is binding against the third-party employer and carrier because of the possible applicability of § 264, Mississippi Code Annotated, which states:

"An action shall not be brought whereby to charge a defendant or other party:

(a) Upon any special promise to answer for the debt or default or miscarriage of another person;

\* \* \* \* \*

Unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some person by him or her thereunto lawfully authorized in writing."

16. Section 383–01, et seq., Miss.Code of 1942, Rec.

Supreme Court reversed a finding of dependency by the Commission and the Circuit Court, and held that the acknowledged illegitimate son of the deceased employee therein was not dependent within the meaning of the statute. The child, at the time of the employee's death, had been living in the home of his mother and stepfather for the preceding four years, his mother having subsequently married after his illegitimate birth. He was furnished all clothing, sustenance and school expense by the stepfather. The Court noted that although the testimony was vague as to the extent of support of the claimant prior to the mother's subsequent marriage, apparently it had been practically nothing for a number of years. The contributions by the decedent to the support and maintenance of the child during the past four years, however, had consisted of "three pairs of pants, a shirt, and now and then a nickel, dime or quarter." Based on these past contributions, the Court concluded that the "claimant" had no expectation of receiving any substantial support whatsoever from Mitchell [the employee] in the future." In discussing the elements necessary in order to show factual dependency, the Court stated:

"As to the definition of dependency, this Court, in Deemer Lumber Co. v. Hamilton, 211 Miss. 673, 52 So.2d 634, 637, quoted this language, taken from 58 Am.Jur., Workmen's Compensation, Section 162: 'As a very general proposition, it may be said that a dependent is one who looked to or relied on the decedent for support and maintenance. Reliance must have been placed upon the deceased employee to provide the applicant for compensation, in some measure or to some extent, with his or her future living expenses. And where this is the case, it is not material that the contributions were made at irregular intervals, or in differing amounts, nor that the money was paid in accordance with the provisions of a contract. The purpose of the statute is to provide the workman's dependent in the future with something in substitution for what has been lost by the workman's death, and, consequently, to establish dependency, the applicant for compensation must show that he or she had reasonable grounds to anticipate future support from the decedent. This reasonable expectation of continuing or future support and maintenance seems to be the true criterion as to who are dependents.' "

In the case of Magnolia Construction Co. v. Dependent of Stovall, 250 Miss. 761, 168 So.2d 297 (1964), the Court, after quoting the above language from *Fernwood, supra,* concluded by noting that "dependency is determined as of the time of the injury by looking to the past to determine the reasonable expectations of support in the future." The facts of this case are quite significant in that the claimant was the mother of the deceased employee and sought workmen's compensation benefits after his employment-related death on July 9, 1962. The decedent had been convicted of manslaughter in 1957 and was incarcerated in the penitentiary until May 25, 1962. Prior to his conviction, he had contributed to his mother's support since the age of thirteen. The decedent worked for the employer for less than one month before he was killed, but did contribute a part of the proceeds from the four weekly paychecks received during this time to his mother for groceries and clothing. In holding that these facts were sufficient to establish reasonable expectations of support in the future, the Court stated:

"In considering these principles of law as they relate to the above undisputed facts, it is evident that Matilda [the mother] was in fact partially dependent upon her son for the ordinary necessities of life at the time of his death, he having contributed to his mother's support for which she had desperate need, from the age of thirteen until his death, exclusive of the time he was incarcerated, and more important, he contributed to his mother's support upon his release from the

penitentiary as he had always done theretofore when gainfully employed."

In the case sub judice, it is undisputed that the two minor children lived with and were wholly dependent upon their father, Patrick Wright, from their birth until the death of their mother in March, 1966. Patrick Wright had provided them with clothing, food, and all the ordinary necessities of life. Following the death of Virginia Freeman, the decedent arranged with Mrs. Belton, the mother's sister, to care for these children, promising $20.00 per week in support. (Tr. p. 17). Under the circumstances, this action was certainly not an indication of abandonment by the decedent. Although the family had resided in Lucedale, Mississippi, the decedent, Wright, was employed in Pascagoula, Mississippi, located some distance away. He had no family of his own who could care for the two young children, and the arrangement made, at that time, was undoubtedly in the children's best interest.

The difficulty in this case comes thereafter because the decedent fell far short of paying the amount he had agreed to provide for the support of these children, his actual contributions consisting of $44.00, $20.00 of which was given to the older child individually, and some material to make dresses for the two girls. (Tr., pp. 21, 22). The decedent did, however, repeatedly inform Mrs. Belton that the promised financial assistance would be forthcoming. Although the excuses offered by him to Mrs. Belton for his failure to live up to the agreement seem somewhat unbelievable in retrospect (i. e., difficulties with his car requiring expenses; numerous other debts in Pascagoula; a desire to have the children return to live with him after a planned remarriage), it was through these procrastinations and the many promises to send the financial support, obviously relied upon by Mrs. Belton, that the decedent was able to secure and insure the well-being of the two children during the 18 month period after the death of their mother. Mrs. Belton testified unequivocally that she and her husband, who has subsequently passed away, were in no financial condition to support the children. (Tr. of Hearing, pp. 22, 23).

The record reveals that two months prior to the death of the decedent, he had the two children in his custody in Mississippi for approximately four weeks, although there is some dispute as to the support actually given the children by the decedent, inasmuch as they stayed with a family named Benyards. This family had lived next door to the decedent and Virginia Freeman during their residence in Lucedale. Nevertheless, this action certainly demonstrates the decedent's continued concern with the welfare of his children, and certainly strengthened Mrs. Belton's reliance upon his heretofore unfulfilled promises of financial assistance and return of the children to live with him.

The two principal cases cited by the plaintiff on the issue of dependency, Magma Copper Co. v. Aldrete, et al., 70 Ariz. 48, 216 P.2d 392 (1950) and Croom v. Cochran, Tex.Civ.App., 379 S.W.2d 957 (1964), denied recovery of benefits under state compensation laws. The proof of dependency in each of these cases was based primarily upon contractual obligations undertaken by the deceased employees to support a minor stepchild and mentally retarded child, respectively. As heretofore noted, this Court concurs with the finding in these two cases that a contractual obligation is only one of the factors to be considered and must be weighed with other evidence in determining dependency. The factual situations in these two cases, however, are clearly distinguishable from that in the case sub judice.

It is the opinion of this Court, based upon the events preceding the death of Patrick Wright, as heretofore outlined, that the two minor children, Patricia and Wanda Lynn Wright, did have reasonable expectations of receiving support in the future from their father and were therefore dependent upon him within the meaning of the Long-

shoremen's Act. There is no merit in the plaintiff's contention that any finding of dependency should be partial and thus limited to an amount designed to conform to the actual monetary contributions over the 18 month period preceding the death of Wright. This is only one of the many elements relied upon by the Deputy Commissioner in awarding full compensation, limited by the provisions of the Act.

■ As the Court has concluded that the dependency element has been established in this case, it is actually unnecessary to determine the constitutional issue raised by the defendant and intervenor. This contention is that to require illegitimate children to prove dependency, whereas legitimate children under the age of 18 are conclusively presumed to be dependent, results in an "invidious discrimination" contrary to the equal protection clause of the Fourteenth Amendment. This contention rests heavily on the rationale of two recent Supreme Court decisions, Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed. 2d 436 (1968) and Glona v. American Guarantee and Liability Insurance Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968). *Levy* involved the Louisiana Wrongful Death Statute which had been construed to authorize actions on behalf of legitimate children for the wrongful death of their mother, but to deny the same right to illegitimate children. The Supreme Court held that since the illegitimacy of the children's birth had no rational relation to the nature of the wrong allegedly inflicted on the mother, there being no rational legislative purpose supporting such discrimination, the equal protection clause of the Fourteenth Amendment had been violated by denying them the right to maintain an action for their mother's wrongful death. The Court further stated:

"While a State has broad power when it comes to making classifications (Ferguson v. Skrupa, 372 U.S. 726, 732, 83 S.Ct. 1028, 1032, 10 L.Ed. 93, 98, 95 A.L.R.2d 1347), it may not draw a line which constitutes an invidious discrimination against a particular class. See Skinner v. Oklahoma, 316 U.S. 535, 541–542, 62 S.Ct. 1110, 1113–1114, 86 L.Ed. 1655, 1660. Though the test has been variously stated, the end result is whether the line drawn is a rational one. See Morey v. Doud, 354 U.S. 457, 465–466, 77 S.Ct. 1344, 1349–1351, 1 L.Ed.2d 1485 [1491, 1492]." 391 U.S. at 71, 88 S.Ct. at 1511.

This Court is of the opinion, however, that the treatment afforded illegitimate children under the Longshoremen's Act is not a categorical setting apart of a class of persons which is unsupported by a rational legislative purpose. Unlike the wrongful death statute under consideration in *Levy, supra,* and *Glona, supra,* the Longshoremen's and Harbor Workers' Act does not contemplate a "wrong done" to an employee due to an industrial accident, but instead contemplates compensation for the loss of wages in case of injury and loss of support in case of death. It cannot be said that all children of an employee, particularly a male employee, are presumably dependent upon him and lose something due to his death. It would certainly be engaging in a factual inaccuracy to even presume that illegitimate children are living with their natural father.

The construction of the statute urged by the defendant and intervenor would not only encourage the continuation of illicit relationships, striking at the home-family as an institution, but would also discourage any support from the father during his lifetime when it is most needed. Furthermore, it would discourage the legitimation of children through marriage, with the father secure in the knowledge that support will be forthcoming in the event of his death.

It should be further noted that the statute does not create a conclusive presumption of dependency for children over the age of 18, legitimate or illegitimate. They too must establish dependency and this is certainly in keeping with the purpose of the act which is to provide the

workman's dependents a substitution for that which was lost by his death and relieve society of the burden of supporting helpless children who are without means of support due to an industrial accident.[17]

The answer to the constitutional issue raised herein is by no means clear, because an inconsistency certainly exists with respect to the conclusive presumption afforded legitimate children. This conclusive presumption was determined through a construction of the statute by the Court in Maryland Dry Dock Co. v. Parker, 37 F.Supp. 717 (D.C.Md., 1941). The Court reasoned that since the dependency requirement of the Act was specifically omitted as a prerequisite for compensation to a child under 18 years of age, the contrary being true for children over 18 years of age and for acknowledged illegitimate children, Congress intended that legitimate children under 18 years of age were not required to prove dependency. This interpretation has been accepted, without comment, by numerous cases subsequent to this decision.[18] The Court in *Parker, supra,* in determining that dependency in fact is excluded as a condition precedent to recovery of legitimate children under the age of 18, relied heavily in justifying such exclusion on the language of the Court in Crockett v. International R. R. Co., 176 App.Div. 45, 162 N.Y.S. 357, pp. 358–359, interpreting the New York Workmen's Compensation Act, containing virtually identical language. The New York Court stated:

"Death benefits payable to wife and children, however, in no respect rest upon the question of their dependency. That very clearly appears from said section 16. Death benefits under that section to all other persons rest on the dependency of such person or persons to the deceased employé. That is true

of husband, parents, brothers, sisters, grandparents, or grandchildren of the deceased. But a surviving wife and children under 18 years of age are entitled to an award, although they may be wealthy. The distinction exists because of the legal and moral responsibility of a husband and father to support his wife and children, irrespective of their individual means of support."

There is a clear distinction between a voluntarily undertaken contractual obligation to support and a father's common law primary obligation to support a minor child, which is the legal obligation to which the Court had reference. As heretofore noted, however, a father of a child born out of lawful wedlock is, under Mississippi law, liable to the same extent as a father of a child born of lawful wedlock to provide for the education, necessary support and maintenance of a child. This liability is enforceable upon a lawful determination of paternity or acknowledgement of paternity in writing. One cannot, however, hold the estate of the father liable under the Mississippi Uniform Act on Paternity unless an action has been commenced during the lifetime of the father.[19] In the case sub judice, the obligations of the father under the Act were not enforced during Patrick Wright's lifetime through the establishment of paternity and an order requiring support of the children. The necessity of such enforcement or its effect on the rationale underlying the requirement that illegitimate children prove factual dependency, is certainly unclear. It is significant to note that although a conclusive presumption of dependency has been read into the Mississippi Compensation Act under § 6998–13(g), see Anderson-Tully Co. v. Wilson, 221 Miss. 656, 74 So.2d 735 (1954), the Mississippi Supreme Court

---

17. Stanley v. McLendon, et al., 220 Miss. 192, 70 So.2d 323 (1954); Mid-State Paving Co., et al. v. Farthing, et ux., 233 Miss. 333, 101 So.2d 850 (1958).

18. See Turnbull v. Cyr, 188 F.2d 455 (C.A. 9, 1951); Ellis v. Henderson, 204 F.2d

173 (1953); Texas Employers' Insurance Association v. Shea, 410 F.2d 56 (C.A.5, 1969).

19. Section 383–01, et . seq., Mississippi Code of 1942, Rec.

in Fernwood Industries, Inc. v. Mitchell, 68 So.2d 830, at 832 (1953), clearly stated that "even in cases where the presumption exists the fact of non-dependency may be shown. It is a rebuttable presumption." Citing Thomas v. Contractor's Material Co., Inc., 213 Miss. 672, 57 So.2d 494. Nevertheless, this Court is of the firm opinion that there is no "invidious discrimination", contrary to the equal protection clause of the Fourteenth Amendment, in requiring that illegitimate children prove factual dependency in order to recover under the Act.

The Deputy Commissioner determined that the minor children, Patricia Wright and Wanda Lynn Wright, were children in relation to whom the decedent had stood in loco parentis for more than one year prior to his death. 33 U.S.C. § 902 (14). This is an alternative ground for relief under the Act, although there is, of course, a great deal of overlapping with respect to the factual elements indicating proof of the child's status as an acknowledged illegitimate child dependent upon the deceased.

A full review of the evidence, heretofore examined in detail, in this case is certainly unnecessary in considering this issue and would be unduly repetitious. In his findings, the Deputy Commissioner noted:

"* * * while the decedent did not have the children living with him after March, 1966, and his actual contributions to their support were irregular, erratic, and far short of the amount he had agreed to provide, the children were benefitting as a result of his pledge (which he, repeatedly, renewed in conversation with Mrs. Belton) and there is no indication that he abandoned the children or ceased to be concerned with their welfare, as evidenced by the fact that about two months prior to his death he had the children with him in Mississippi for approximately four weeks; that it is the judgment of the Deputy

Commissioner that, while the decedent's largely dishonored commitment to Mrs. Belton must be regarded as showing a lack of conscientiousness in regard of his financial responsibility, it does not detract from the fact that he recognized a responsibility for the children and he was able, by possibly devious means, to insure their well-being in the home of Mrs. Belton, something he would, obviously, have been unable to do by himself in his own place of residence; that the Deputy Commissioner, accordingly, holds that the minor children, Patricia Wright and Wanda Lynn Wright, continued to be acknowledged children and children in relation to whom the decedent had stood in loco parentis for more than one year prior to his death, and they are surviving children within the meaning of the Act;"

The record of course is clear that Patrick Wright acquired the status of one "in loco parentis" to the two children from their birth up until the death of their mother, Virginia Freeman, in 1966. During this period of time, Patrick Wright had the children in his home treating them as members of his family and providing parental supervision, support and education, the elements normally required for a finding of "in loco parentis."[20] The Deputy Commissioner was obviously of the opinion that the decedent's "in loco parentis" status was not affected by the events transpiring in the 18 month period between the death of the mother in 1966 and the employment-related death in 1967 for the reasons noted in the above quoted portion of his findings of fact. Considering the liberal purposes of the Longshoremen's and Harbor Workers' Compensation Act and the strong presumption in favor of the Deputy Commissioner's findings, this Court cannot say that the finding of a continuation of the "in loco parentis" status, bringing it within the one year prior to injury requirement, is irrational

20. W. R. Fairchild Construction Co. v. Owens, Miss., 224 So.2d 571 (1969); Stanley v. McLendon, 220 Miss. 192, 70 So.2d 323 (1954).

or unsupported by substantial evidence. Whether the "in loco parentis" relationship exists is certainly a matter of intention and of fact to be deducted from the circumstances of a particular case. Farve v. Medders, 241 Miss. 75, 128 So. 2d 877 (1961). Although this Court is of the opinion that the evidence in this case more strongly supports a finding that the minors herein are acknowledged illegitimate children dependent on the decedent, it is also sufficient to support the alternative finding that the minors are children in relation to whom the decedent stood in loco parentis for more than one year prior to his death.

Accordingly, the findings of the Deputy Commissioner will be affirmed, and the plaintiffs' petition to enjoin and set aside the Compensation Order entered herein will be denied.

An Order conforming with the above Opinion, approved as to form by all counsel, shall be submitted to the Court within the time and manner prescribed by the Rules of this Court.